Spray Water Power and Land Company v. Commissioner.
Spray Water Power & Land Co. v. Commissioner
Docket No. 73024.
United States Tax Court
T.C. Memo 1961-73; 1961 Tax Ct. Memo LEXIS 277; 20 T.C.M. (CCH) 353; T.C.M. (RIA) 61073; March 16, 1961
Wm. H. Westphal, Esq., Southeastern Bldg., Greensboro, N. C., and Wm. J. Adams, Jo., Esq., for the petitioner. Harvey S. Jackson, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined a deficiency in the income tax of petitioner in the amount of $6,945.71 for the taxable period August 1, 1953 to March 31, 1954. The sole issue for decision is whether an amount received by petitioner was ordinary income or, as claimed by petitioner, not taxable at all. Findings of Fact Some of the facts have been stipulated and are incorporated herein by reference. Petitioner is a corporation, organized and existing under the laws of the State of North Carolina, with its principal office at Spray, North Carolina. Petitioner's income tax return on an accrual *278 method of accounting for the taxable period August 1, 1953 to March 31, 1954 was filed with the director of internal revenue, Greensboro District. Petitioner owned a dam on the Smith River, a canal leading from the river and certain other adjoining lands and improvements. On April 14, 1898, petitioner conveyed a parcel of land to Nantucket Mills, hereinafter referred to as Nantucket, for a consideration of $1,000 and entered into an agreement with Nantucket to furnish forever from its canal, water sufficient to produce 200 horsepower each day between the hours of 6:00 A.M. to 7:00 P.M., excluding Sundays and legal holidays, in consideration of the payment of $2,000 yearly, to be payable in semiannual payments. Prior to the execution of this agreement, petitioner had entered into other agreements to rent certain quantities of water rights from its canal, also measured in horsepower. The agreement with Nantucket was made expressly subject to these prior agreements, which meant that if the horsepower available to petitioner from the Smith River was insufficient at any time to supply the full horsepower in the prior agreements, then the quantity of water power Nantucket was to receive *279 would abate and be diminished proportionately during the period of such insufficiency, even to the extent of a total loss of such water power. The yearly payment of $2,000 by Nantucket would not be abated nor would any allowance be made on account of any diminution and loss of the water power. Other pertinent provisions of the agreement of April 14, 1898 between petitioner and Nantucket are as follows: Article 6. The grantor is to construct and forever keep in good repair the principal canals; and from time to time, as the occasion may require, it is to remove and clear out obstructions that may accumulate therein, always excepting ice. The penstocks, flumes, wheel rooms and other water connections are to be made, maintained, belong to and kept in good repair by the grantee, and each water intake shall be joined to the grantor's water course in a durable, substantial and water tight manner. The grantee is also to make and maintain a good and substantial stop gate at the head of each water intake which shall be so constructed that when requisite it may be closed whether the water be then passing through the intake or not; and that when closed it shall shut out the water from said *280 intake. And the grantee shall construct said penstocks, flumes, wheel rooms and other water connections so that water may be shut out from them without injury to them. All the work contemplated in this article shall be done * * * in a manner satisfactory to the grantor. Article 7. If the grantee shall suffer damage from want of water from causes not arising from the neglect or misconduct of the grantor and which may be removed or remedied, and the grantor shall, after due notice for that purpose, unreasonably fail to remove the obstructions or remedy the mischief, the grantee may in the best manner it may be able remove or remedy the cause of the injury at the grantor's expense; and to pay and indemnify it for the expenses and charge thereby incurred it shall, after the expiration of 30 days from the time the amount of such expense shall have been adjusted and agreed to by the parties or ascertained by final judgment or by award of arbitrators, have a lien upon all the rents which may have been reserved to the grantor herein and which may become payable after the expiration of said thirty days and may withhold and apply the same until it shall be fully reimbursed as aforesaid. *281 Article 8. The grantee is not to use more water than granted nor waste it nor permit it to be wasted for want of repairs or through the deficiencies of its works or otherwise and if so wasted or more be used than granted the grantor may stop the water from entering the flumes by closing, locking and sealing the gates across them, or by any other method until such waste or excessive use be sufficiently guarded against and may also at the same time maintain its action for damages. * * *
Article 12. If any grantee, its successors or assigns * * * shall fail to pay the rent duly, and the grantor * * * shall in a proper court have recovered final judgment for damages * * * for the rent so in arrear or damages for nonpayment of such rents, * * * and the grantee, its successors, or assigns, for the space of ninety days after due notice thereof, shall fail to pay and satisfy the judgment so recovered touching said rent, * * * then the mill and horse power with all the lands and buildings attached or belonging thereto, * * * shall become so far forfeited that it shall be lawful for the grantor, * * * to enter in and upon the said granted premises and the same again to have, hold and *282 possess and enjoy as of his, the grantor's former estate therein; * * * until such judgment or debt for rent or damages, shall have been paid with interest * * * together with all the costs, charges and expenses incurred in thus interfering and taking and holding possession; and if such payments and reimbursements shall not be made within three years from the time of said entry then the grantor * * * shall, at the expiration of that period, continue to hold the granted premises so entered upon to the sole use of itself, * * * forever, without any right of redemption by the grantee * * * Article 13. In case the grantee shall bona fide sell or convey any horse power with the land originally granted therewith or when several horsepowers are granted in the same deed and the land conveyed with them is not therein specially divided, apportioned and attached to each, if the grantee shall bona fide sell or convey anyone of them with such part and portion of the land that shall be necessary and convenient for the profitable use and employment of the power or powers sold, leaving sufficient for the profitable use and employment of the power or powers unsold, the assignees or purchasers shall *283 be holden to pay the rent of the horse power sold and to perform all the agreements, convenants and conditions relating thereto and connected therewith; and the grantor will not hold the original grantee responsible therefor unless such conveyance or assignment be made fraudulently with the intent to defeat the grantor of any of his said rents or of his remedies for breach of any agreements or unless the said grantee shall reserve a rent out of the premises to itself or others or shall retain some estate, title or interest therein; provided such assignees or purchaser shall in some legal mode bind themselves and their heirs or successors, and assigns, to the said grantor, its successors or assigns, to perform, fulfill, keep and observe all the terms, conditions, convenants, and all other matters and things touching the property and estate assigned which were obligatory upon the original grantee, its successors or assigns. And in case of any sale as aforesaid, of any one or more horse powers originally conveyed by the same deed with the proper and convenient part of the land as before stated, and a compliance by the assignee or purchaser with the terms of the foregoing proviso, the *284 premises so by such sale severed and divided as well as those so sold, as those unsold shall be, and shall be considered in all respects as if the same has been originally severed in like manner and had been granted and conveyed by the grantor in several and distinct conveyances and all the covenants, agreements, conditions and other things of and concerning the whole of the granted premises, shall apply to each part of said premises after such conveyance in like manner as if each of said parts had been conveyed alone, the rent however reserved for all the powers granted in the original deed, to be divided proportionately to and among the powers sold and those unsold. * * *
Article 17. The power to be developed as aforesaid shall not be used elsewhere than on the demised premises, nor shall it be let or assigned to any other person at any price less than that which at the time may be charged by the grantor for similar blocks of power for similar purposes; but no such transfer shall release any party claiming hereunder from any obligation of this lease, unless nor until such transfer shall have been approved and such transfer accepted by written instrument executed by the grantor *285 specifying the fact and extent of such release. Petitioner entered into a tripartite agreement on January 20, 1915, with Nantucket and The Thread Mills Company whereby The Thread Mills Company assumed the obligations of Nantucket in the 1898 agreement in regard to the 200 horsepower. The duration of the agreement was changed from "forever" to 999 years and the petitioner released and discharged both Nantucket and The Thread Mill Company: from the terms, conditions and provisions of said deed and contract of April 14th, 1898, in so far as the same provides for a lien reserved to the said Spray Water Power & Land Company, for the payment of the rental reserved for said water power, and for a forfeiture of the estate in the land therein conveyed, in case said rental is not paid. On July 2, 1917, Nantucket conveyed certain real property embracing its mill site to Carolina Cotton and Woolen Mills Company, which thereafter on May 31, 1934, conveyed the property, including the mill site, to Marshall Field and Company. On December 21, 1953, Marshall Field and Company conveyed the mill site property to Fieldcrest Mills, Inc., hereinafter referred to as Fieldcrest. Petitioner entered *286 into a contract with Fieldcrest on January 15, 1954, which provided the following: WHEREAS, Fieldcrest * * * now desires to be relieved of the obligations assumed by it as aforesaid, and particularly the obligations to make said annual payments, and the Water Company is willing to release said obligations as hereinafter provided; and WHEREAS, the Water Company desires to be relieved of the obligations imposed upon it by and under said deed dated April 14, 1898, * * * particularly the obligation to furnish two hundred (200) horsepower * * * and Fieldcrest is willing to release said obligations; and * * *
the parties hereto have convenanted and agree with each other as follows: The Water Company, * * * hereby expressly releases Fieldcrest, * * * from the rights reserved to the Water Company, * * * by the above mentioned deed dated April 14, 1898, or the above mentioned deed and contract dated January 20, 1915, and any and all claims and demands arising out of or based on such rights or obligations, including especially, but not limited to, the obligation to pay a yearly rental for two hundred (200) horsepower as provided in said deed of April 14, 1898, * * *. Fieldcrest, *287 * * * hereby releases the Water Company, * * * from the rights reserved to the Nantucket Mills and/or The Thread Mills Company, their respective successors and assigns, * * * including especially, but not limited to, the obligation to furnish two hundred (200) horsepower to Nantucket Mills and/or The Thread Mills Company, their respective successors and assigns, * * *. Fieldcrest sells, assigns, transfers and conveys to the Water Company the waterwheel and electric generator now owned by Fieldcrest, located on the east bank of the Water Company's canal between the waterwheels of the Spray Cotton Mills Company, both in the condition in which they now are, together with any and all its rights of ingress and egress across the lands of the Spray Cotton Mills Company for the purpose of operating and maintaining said waterwheel and electric generator granted to said Nantucket Mills, * * *. Fieldcrest expressly reserves and retains for itself, its successors and assigns, the right granted in said deed of April 14, 1898 to lay, keep in repair, and replace pipes to convey water from the Water Company's canal to and about the buildings now located, or in the future to be located, on the *288 Nantucket Mill Site for protection against fire and for use in its boiler or boilers thereon, and to erect and maintain the fire hydrants necessary for such protection, and to lay and keep in repair a drainage pipe from its closets and dyehouse to discharge into the tailrace of the Water Company. * * * subject, however, to the reserved right of the Water Company to draw off the water from its canal for the purpose of clearing out, removing obstructions therein, or repairing the same. The Water Company hereby grants to Fieldcrest, its successors and assigns, an easement over, under, or through property of the Water Company, its successors and assigns, for purposes of laying, keeping in repair and replacing pipes to convey water from Smith River to and about buildings now located or in the future to be located on the Nantucket Mill Site for protection against fire and for use in its boiler or boilers thereon, and to erect and maintain fire hydrants for such protection, and to lay and keep in repair a drainage pipe from its closets and dyehouse to discharge into said Smith River, it being understood that no pipes other than replacements for the above purposes will be so laid over, under, *289 or through property of the Water Company, its successors and assigns, to Smith River unless and until said Water Company, its successors and assigns, ceases to maintain its principal canals in good repair. In the event that there is now in force any other agreement or agreements between the Water Company and Fieldcrest, * * * relating to the furnishing of or payment for horsepower, said agreement or agreements, to the extent that they require or may require the furnishing of or payment for water power, are hereby declared to be null and void. As consideration for this contract Fieldcrest paid petitioner $25,000. The $2,000 which the petitioner received annually in return for the 200 horsepower of water rights had been consistently reported on its income tax returns as rental income in prior years. Opinion The sole issue presented concerns the payment of $25,000 from Fieldcrest to petitioner. A divergence of views exists between the Commissioner and petitioner regarding the nature of this payment. The Commissioner determined that the amount received by petitioner was in lieu of future earnings and constituted ordinary income. The petitioner, on the other hand, contends that *290 it was the proceeds from the sale and disposition of a capital asset having a basis in excess of the amount received and did not give rise to any taxable income. It hardly need be said that the treatment of payments received as a result of the cancellation of contractual rights has been the subject of confusion. Cf. Jones v. Corbyn, 186 F. 2d 450 (C.A. 10, 1950); Commissioner v. Starr Bros., 204 F. 2d 673 (C.A. 2, 1953). Although the fog has not yet cleared in the area, one requisite has emerged as a guiding light in the disposition of this type of case. It is the "sale or exchange" test. Capital gains treatment has been afforded in those cases in which the courts have found a sufficient transfer of property to the payor to bring the transaction within the concept of a "sale or exchange" under section 117, I.R.C. 1939. Cf. Isadore Golonsky, 16 T.C. 1450 (1951), affd. 200 F. 2d 72 (C.A. 3, 1952), certiorari denied 345 U.S. 939 (1953); Louis W. Ray, 18 T.C. 438 (1952), affd. 210 F. 2d 390 (C.A. 5, 1954). certiorari denied 348 U.S. 829 (1954); McCue Bros. & Drummond, Inc. 19 T.C. 667 (1953), *291 affd. 210 F. 2d 752 (C.A. 2, 1954), certiorari denied 348 U.S. 829 (1954); Henrietta B. Goff, 20 T.C. 561 (1953), affd. 212 F. 2d 875 (C.A. 3, 1954), certiorari denied 348 U.S. 829 (1954). However, where there was nothing transferred and the rights of the parties "merely came to an end and vanished" the entire amount realized was held to be ordinary income. Commissioner v. Starr Bros., supra, at page 674. Cf. Hort v. Commissioner, 313 U.S. 28 (1941); Charles E. McCartney, 12 T.C. 320 (1949); Marc D. Leh, 27 T.C. 892 (1957), affd. 260 F. 2d 489 (C.A. 9, 1958). In the instant case petitioner claimed neither gain nor loss on the transaction; however, to prevail it is incumbent upon petitioner to show that the transaction here involved effected a property disposition. Isadore Golonsky, supra. We agree with the initial proposition advanced by petitioner that a contract right can be a capital asset and can have a basis for computing gain or loss upon its subsequent $&357 disposition. Petitioner, in accord with this proposition, contends, *292 that the 1898 deed effected a sale and conveyance of land and a permanent easement in water rights. It submits, despite some equivocation in an additional brief, that in return for this conveyance it obtained a valuable right to receive $2,000 yearly which right was sold and disposed of in 1954 for $25,000. We do not agree. It is implicit in both the 1898 conveyance and the 1915 tripartite agreement that petitioner's right to receive $2,000 yearly was in consideration of its reciprocal obligation to furnish water adequate to produce 200 horsepower, and was not the proceeds from the sale and transfer of a property interest in 1898. As we see it, the relationship created in 1898, although it may have been an outgrowth of a sale of land, was more analogous to a lease arrangement. We think the yearly payments were correctly characterized by their designation in the instrument as "rents." The payments were clearly ordinary income to petitioner and were so treated by petitioner on its income tax return where it reported them as "rental income." This is consistent with the stated purpose of the subsequent termination agreement in 1954 which was to release Fieldcrest from "the obligation *293 to pay a yearly rental for 200 horsepower." When we view the transaction in this light, it amounts to a release by petitioner to Fieldcrest of its obligation to pay $2,000 yearly, and we are unable to find that there was any sale or disposition as alleged. The sum received in consideration for the relinquishment of the right did not result in an enlargement of the rights of Fieldcrest which might be treated as a "sale or exchange"; rather, the amount in question was paid in lieu of rents Fieldcrest was otherwise obligated to pay and constituted merely a present release by petitioner of a right for a "lump sum consideration [which] seems essentially a substitute for what would otherwise be received at a future time as ordinary income." Commissioner v. P. G. Lake, Inc., 356 U.S. 260, 265 (1958). See Marc D. Leh, supra."The contract here was not sold, it was extinguished." Charles E. McCartney, supra.Such a finding brings this transaction squarely within the ambit of Hort v. Commissioner, supra.In Hort the lessee paid the lessor a lump sum to be released from a long term lease. The Court held that the amount was "clearly a substitute *294 for rental payments" and constituted ordinary income in the hands of the lessor. In the instant case the cash payment was just as "clearly a substitute for rental payments" as in Hort. It follows that it constitutes ordinary income in the hands of petitioner. The testimony elicited from an actuary in regard to the present value of the contract has little relevancy in view of our holding that there was no "sale or exchange." This present value aspect was also present in Hort and we think the Court's resolution of the problem there is equally applicable here. There is was said: that petitioner must report as gross income the entire amount received for cancellation of the lease without regard to the claimed disparity between that amount and the difference between the present value of the unmatured rental payments and the fair rental value of the property for the unexpired period of the lease. The cancellation of the lease involved nothing more than relinquishment of the right to future rental payments in return for a present substitute payment and possession of the leased premises. Undoubtedly it diminished the amount of gross income petitioner expected to realize, but to that extent *295 he was relieved of the duty to pay income tax. * * * The determination of the Commissioner is sustained. Decision will be entered for the respondent.