McCue Bros. & Drummond, Inc., Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 31854. Promulgated January 21, 1953.

*Murray F. Johnson, Esq.*, for the petitioner.
*Robert McDonough, Esq.*, for the respondent.

## OPINION.

Rice, *Judge:* Respondent determined deficiencies in income and excess profits taxes for the taxable year ended October 31, 1946, in the respective amounts of $1,820.91 and $3,361.68. The only issue is whether the sum of $22,500 received by petitioner from Jamlee Hotel Corporation was taxable as ordinary income or as capital gain.

The facts were stipulated. The stipulated facts are so found and are incorporated herein by reference.

Petitioner was incorporated under the laws of New York in 1923. It was engaged in the business of retailing men's hats. For the taxable year ended October 31, 1946, it duly filed its returns on the accrual basis.

From 1928 to June 30, 1946, petitioner operated a retail hat store at 1294 Broadway, New York City. This store was on the street level on the west or Broadway side of the Hotel McAlpin.

Under date of December 23, 1942, petitioner, as tenant, and the New York Life Insurance Company, as landlord, executed a lease with respect to such store. The lease term was for 3 years commencing February 1, 1943, and ending January 31, 1946. The rental provided for therein was a variable amount "equal to 15% of the gross sales in the demised premises, * * *."

On June 27, 1945, Jamlee Hotel Corporation, which had been formed on June 6, 1945, and was an affiliate of Crawford Clothes, Inc., bought the Hotel McAlpin from petitioner's landlord. Plans were made for the new, large Crawford Clothes store which now occupies the entire block-front of store space on the Broadway side of the hotel from Thirty-third to Thirty-fourth Streets. Work was started on this project in February 1946.

In February 1946, Jamlee Hotel Corporation (hereinafter referred to as Jamlee) approached the petitioner and commenced negotiations

which continued for several months, culminating in a written agreement dated May 17, 1946. Such agreement recited, among other things, that petitioner occupied a store under a written lease from Jamlee's predecessor in title, that the lease expired by its terms on January 31, 1946, and petitioner continued in possession, and that Jamlee was conducting alterations to the Broadway side of the Hotel McAlpin and desired to include petitioner's store in such alterations. The agreement then provided that petitioner's tenancy and occupancy of the store should terminate for all purposes on June 30, 1946, and that it would vacate and surrender the store on that date. Jamlee agreed to pay petitioner $22,500 at the time it vacated and surrendered the store provided this occurred on or prior to June 30, 1946, time being of the essence. The agreement further provided that the rent payable under petitioner's lease dated December 23, 1942, and the other terms and conditions of such lease should apply to petitioner's tenancy and occupancy of the store up to and including June 30, 1946.

On June 28, 1946, petitioner vacated and surrendered the store space to Jamlee, which simultaneously delivered to petitioner a certified check for $22,500.

In its return for the fiscal year ended October 31, 1946, petitioner reported this amount as a long term capital gain under the legend "Amount received for surrendering interest in 1294 Broadway, New York, N. Y."

Sections 8 and 13 of chapter 314 of the Laws of New York of 1945 provide in part as follows:

Sec. 8. So long as the tenant continues to pay the rent to which the landlord is entitled, under the provisions of this act, no tenant shall be removed from any business space, by action or proceeding to evict or to recover possession, by exclusion from possession, or otherwise, nor shall any person attempt such removal or exclusion from possession, notwithstanding that such tenant has no lease or that his lease or other rental agreement has expired or otherwise terminated, and notwithstanding the issuance of any order to dispossess, warrant or process prior to the effective date of this act, and regardless of any contract, lease, agreement or obligation heretofore or hereafter entered into which is inconsistent with any of the provisions of this act, * * *.

    *       *       *       *       *       *       *

Sec. 13. * * * Any lease wherein the specified rent or any part thereof is variable according to volume or other criteria of volume of the tenant's business shall continue without change, but where such lease provides for the payment of a fixed, basic or minimum rent, such fixed amount shall be subject to the provisions of this act. * * *.

The above provisions of law were extended by reenactments to July 1, 1952.

Petitioner contends that the $22,500 received from Jamlee for surrendering and vacating its store space was a long term capital gain

within the meaning of section 117 (a) (4), Internal Revenue Code, which defines that term as "gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing net income." To qualify under this definition, petitioner must establish that the transaction with Jamlee was (1) a "sale or exchange" of (2) a "capital asset" (3) "held for more than 6 months."

Respondent determined that the $22,500 constituted ordinary income, taxable in full, upon the theory that petitioner held no property in the premises which could be considered a capital asset as defined in section 117 (a) (1), that the transaction with Jamlee was not a sale or exchange under section 117, and that, in any event, petitioner failed to satisfy the holding period requirement.

Section 117 (a) (1) defines the term "capital assets" as meaning "property held by the taxpayer" with exceptions not here material. The question posed, therefore, is whether petitioner had any right in the store space, occupied after the expiration of its lease, pursuant to and by virtue of the emergency rent control laws of New York, which would qualify as "property held by the taxpayer" under section 117 (a) (1). Respondent argues that the Court of Appeals of New York has specifically held that a statutory tenant, such as petitioner was here, holds over not because he has any property right or estate in the premises, but because the emergency laws forbid the landlord to evict him. *Wasservogel* v. *Meyerowitz*, 89 N. E. 2d 712 (1949); and *Stern* v. *Equitable Trust Co. of New York*, 144 N. E. 578 (1924).

The cited cases involved emergency rent control legislation, the basic purposes of which were to curb exorbitant rents and widespread evictions. *Bisbano* v. *42—20 Restaurant Corporation*, 113 N. Y. S. 2d 215 (1952). Such legislation must be construed in the light of the purposes sought to be accomplished, *Glauberman* v. *University Place Apartments, Inc.*, 66 N. Y. S. 2d 335 (1946), affd. 70 N. Y. S. 2d 139 (1947), leave to appeal denied 74 N. E. 2d 558 (1947); and must not be extended beyond the evils sought to be curbed. *People ex rel. McGoldrick* v. *Regency Park, Inc.*, 110 N. Y. S. 2d 163 (1952). The *Wasservogel* and *Stern* cases, *supra*, do not hold that a statutory tenant has no property rights; they hold that such rights as the tenants had grew out of the emergency rent control legislation, and not out of any contract, express or implied, between the statutory landlord and the statutory tenant. Actually, both cases state that a statutory tenant has certain rights and privileges under the emergency laws. In the *Stern* case the court stated that the laws extended, against the will of the landlord, the *right of the tenant to remain in possession of the leased premises* so long as he paid a reasonable rental for their use

and occupancy. And in the *Wasservogel* case the court said, p. 716, that where a tenant stays over after an express lease ends *he is exercising a privilege granted him by the emergency rent control laws.* It appears from these authorities, therefore, that petitioner had a statutory right and privilege by the exercise of which it had retained and could continue to retain possession, use, and occupancy of the store premises during the period of the emergency.

We note too that there is a substantial line of authorities in New York which hold that the provisions of an expired lease, not in conflict with the public policy expressed in the emergency rent laws, will be enforced or projected into the statutory tenancy. *11 West 42nd Street* v. *Elzee Realty Corporation,* 100 N. Y. S. 2d 529 (1950) ; *Hunt* v. *Gilmore,* 98 N. Y. S. 2d 322 (1950) ; *Leibowitz* v. *18 East 41st St. Corporation,* 89 N. Y. S. 2d 160 (1949) ; *Barrow Realty Corporation* v. *Village Brewery Restaurant,* 70 N. Y. S. 2d 545 (1947) ; *Glauberman, supra; 130 West 57 Corporation* v. *Hyman,* 66 N. Y. S. 2d 332 (1946) ; *551 Fifth Avenue, Inc.* v. *Masch,* 57 N. Y. S. 2d 554 (1945). And in the *Wasservogel* case the court expressly stated that the "law reads some terms of an express lease into a later statutory tenancy, so as to work out a complete relationship, *Stern* v. *Equitable Trust Co., supra,* * * *"

In determining whether the statutory right and privilege which petitioner had constituted "property" within the meaning of section 117 (a) (1), we have considered and analyzed numerous tax cases. In *Isadore Golonsky,* 16 T. C. 1450 (1951), we held that an amount received by the lessee from the owner for accelerated cancelation of a lease was capital gain since use and possession, valuable property rights, were thereby transferred from the lessee to the owner. In the opinion, we pointed out that the tenant's right to possession and use of the unexpired term was a property right which the landlord paid $7,500 to acquire, and that there was a sufficient transfer of property to bring the transaction within section 117. Our decision was affirmed by the Court of Appeals for the Third Circuit in *Commissioner* v. *Golonsky,* 200 F. 2d 72.

In *Louis W. Ray,* 18 T. C. 438 (1952), on appeal C. A. 5, we stated, p. 441, that "The granting or relinquishment of a right relating to the use of property is the conveyance or transfer of a property right." In that case the taxpayer was paid $20,000 by his lessor to relinquish one of the restrictive covenants in his lease which was preventing the sale of property by the lessor. We held that the lessee sold a property right to his lessor and that the gain derived from the sale was taxable as capital gain.

In *Jones* v. *Corbyn,* 186 F. 2d 450 (C. A. 10, 1950), the Court of Appeals held that the cancelation of an exclusive general insurance

agency for a lump sum was a sale of property and a transfer of capital assets within the meaning of section 117 (a) (1).

*Charles E. McCartney*, 12 T. C. 320 (1949), relied on by respondent, is distinguishable on its facts, as are the decisions by the New York court in *Jaylo Realty Corporation* v. *Bobnor Realty Corporation*, 92 N. Y. S. 2d 448 (1949), and *WMCA, Inc.* v. *Blockfront Realty Corporation*, 67 N. Y. S. 2d 867 (1946).

In view of the numerous authorities examined, including the cases cited, we are convinced that the statutory right of possession, use, and occupancy which the petitioner had in the store premises under the emergency laws was a property right. We are also convinced that there was a transfer of this property right by petitioner to its landlord for $22,500, and that such transfer constituted a sale of a capital asset within the meaning of section 117. Since there is no question about the entire lump sum payment being gain, petitioner is entitled to treat the $22,500 as long term capital gain if the capital asset was held for more than 6 months.

Respondent's contention with respect to the holding period is that the statutory tenancy, being a creature of the emergency rent control laws, was separate and distinct from the tenancy under the original lease, and was neither a continuation of nor a part of it. Petitioner takes the position that its right to remain in possession under its lease had been in existence for over a year, since the emergency rent laws became effective January 24, 1945,[1] and leases with variable rents based on volume of tenant's business were continued by statute "without change."

In our opinion, the property transferred was petitioner's right to possession, use, and occupancy of the premises. This right petitioner held first under the lease and later under the emergency rent control statute. Since the effective date of the rent control statute was January 24, 1945, petitioner's right to possession under such statute existed at least a year before the lease expired, thus complying with the holding period required by section 117 (a) (4). In so deciding, we have carefully considered the various cases cited by respondent but find them to be fully distinguishable.

The deficiencies should be recomputed in accordance with the foregoing opinion. Due to minor uncontested adjustments,

*Decision will be entered under Rule 50.*

Reviewed by the Court.

MURDOCK and RAUM, *JJ.*, dissent.

---

[1] *Twentieth Century Associates. Inc.,* v. *Waldman,* 63 N. E. 2d 177 (1945); *Ronaho Corporation* v. *Morse,* 61 N. Y. S. 2d 545 (1945).