ESTATE OF GRACE M. SCHARF, DECEASED, CHARLES E. SCHARF AND ARTHUR A. SCHARF, COEXECUTORS, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 71277, 71317, 71318.   Filed April 6, 1962.

*Lawrence J. Hayes, Esq.*, for the petitioner in Docket No. 71277.
*James A. Dunkin, Esq.*, for the petitioners in Docket Nos. 71317
*James T. Wilkes, Jr., Esq.*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioners' income tax and additions to tax for the year 1953 as follows:

| Docket No. | Petitioner | Deficiency | Sec. 294(d)(2)[2] addition |
|---|---|---|---|
| 71277 | Grace M. Scharf | $29,530.08 | $2,946.82 |
| 71317 | Arthur H. Hauber and Phyllis Hauber | 195,748.52 | |
| 71318 | Urban V. Comes and Alice T. Comes | 191,019.80 | |

The issues for decision are:

(1) Whether amounts received upon transfer of membership certificates in the Belmont Community Hospital Association constituted capital gains as reported by petitioners or ordinary income as determined by respondent.

(2) As to the latter two petitioners, if the amounts received were capital gains, whether portions thereof were short-term capital gains.

(3) As to the latter two petitioners, cash basis taxpayers, whether a 4-percent first mortgage note received by them in 1953 constituted income in that year.

(4) Whether the first-named petitioner is liable for the addition to tax under section 294(d)(2) of the Internal Revenue Code of 1939 for substantial underestimation of tax liability.

---

[1] Proceedings of the following petitioners are consolidated herewith: Arthur H. Hauber and Phyllis Hauber, Docket No. 71317, and Urban V. Comes and Alice T. Comes, Docket No. 71318.   By order of this Court dated April 3, 1962, Estate of Grace M. Scharf, Deceased, Charles E. Scharf and Arthur A. Scharf, Coexecutors, was substituted as petitioner in Docket No. 71277.

[2] Unless otherwise noted, all references are to the Internal Revenue Code of 1939.

## FINDINGS OF FACT.

Some of the facts have been stipulated and are so found.

Petitioner Grace M. Scharf (Grace) filed her 1953 cash basis Federal income tax return with the district director of internal revenue for the first district of Illinois. She is the widow of Charles E. Scharf, who was a doctor of medicine. Grace is not a doctor of medicine. Petitioners Arthur H. Hauber (hereinafter referred to as Hauber) and Phyllis Hauber are husband and wife. They filed their joint 1953 Federal income tax return with the district director of internal revenue for the first district of Illinois. Petitioners Urban V. Comes (hereinafter referred to as Comes) and Alice T. Comes are husband and wife. They filed their joint 1953 Federal income tax return with the district director of internal revenue for the first district of Illinois.

Hauber and Comes both report their income on the cash receipts and disbursements basis and both were doctors of medicine at all relevant times.

On June 23, 1938, Hauber, Comes, the late Charles E. Scharf, Stanley F. Price, M.D. (Price), and Geary V. Stibgen (an attorney) were issued the five original membership certificates in Belmont Community Hospital Association (hereinafter referred to as Belmont). Belmont was organized on June 18, 1938, as a not-for-profit corporation under the laws of the State of Illinois. Upon its organization, it took over the business and assets of Belmont Hospital, Inc., in exchange for bonds. Belmont Hospital, Inc., was an Illinois business corporation which operated from 1927 to sometime in June of 1938. The controlling stockholders of Belmont Hospital, Inc., were: Charles E. Scharf, Comes, Hauber, and Price. The charter of Belmont provided that the object for which it was formed was as follows:

To establish, own, operate, control, conduct and maintain, not for pecuniary profit, but exclusively for charitable purposes, any one or more of the following: a) A general hospital to provide facilities for the care and treatment of human diseases and ailments of every kind and nature and sick, infirm, indigent, injured and disabled persons of every creed and nationality, excepting the care of neglected and dependent children, said hospital to be known under the name and style of "BELMONT HOSPITAL", at number 4058 West Melrose Street, in the City of Chicago, Cook County, Illinois; b) a training school for nurses; c) A medical, pharmaceutical biological and chemical laboratory or laboratories, to be used in conjunction with the careful and efficient management and operation of a general hospital; 2. To render by all means necessary or expedient, comprehensive and complete service to physicians, surgeons, hospitals and public, private and charitable institutions; 3. To equip and maintain private hospital beds, rooms and wards in said hospital for the use of charity patients; 4. To study, advance and promote the science of medicine and surgery, and pathological, biological, chemical and clinical research; 5. To assist and instruct students of medicine and surgery; 6. To render complete hospital service to meritorious persons incapable of paying for either all or part of such service;

7. To own, operate, maintain, control and conduct said "BELMONT HOSPITAL" as a charitable institution and not for pecuniary profit with a view toward conferring upon the public as much benefit as is consistent with the proper operation, management and control of said institution.

Belmont's bylaws contained, insofar as here pertinent, the following provisions with respect to membership:

## ARTICLE II

### MEMBERSHIP

*Section 1. Membership.* Membership shall consist of one class, to be designated as regular and shall be limited as to number to five members.

*Section 2. Election of Members.* All persons of good moral character and other wise qualified under the By-Laws, rules and regulations of the Corporation shall be eligible to election to membership in the corporation. No person shall be elected to membership except upon his written application for membership signed by the applicant specifying his residence, occupation and such other facts as may from time to time be called for by the Board of Trustees. The application shall be made and submitted to the Board of Trustees and shall be approved by a majority of the Board. Any person elected to membership shall become a member only upon the actual transfer to such person of an existing membership and upon payment of such fees as may then be and become payable by him as a member.

*Section 3. Transfers of Memberships.* Any regular membership shall be subject to transfer under the following conditions:—Any such member in good standing may file with the Board of Trustees, an application for such transfer and may indicate therein the name of a person to whom he desires to transfer such membership, in which event he shall file therewith the written application of such person and such application for membership shall be acted upon in the usual way. If such application is accepted and the applicant elected to membership then the member so desiring to transfer his membership may assign the same to such newly elected member upon payment to the corporation of the transfer fee prescribed by the By-Laws, provided all indebtedness accruing against such membership shall have been paid. If a member desiring to transfer his membership shall not submit the application of the proposed transferee then the Board of Trustees, may under like condition transfer the membership to the first person who may thereafter be elected to membership other than one who shall be elected to take a designated transferred membership. Until the election of a new member and the actual transfer of a membership to such applicant under the terms hereof, the holder of any membership shall continue as a member of the corporation. The duties, obligations, rights and privileges of a member shall continue until the actual transfer of this membership and the filing of an application for transfer shall not stop or prevent any proceedings for the suspension or expulsion of such member.

*Section 4.* If a resignation from membership is offered by any member, the Board of Trustees, in its discretion, may accept or reject the same under such terms and conditions as may be imposed by the Board; when so accepted and all such terms and conditions are complied with, the membership shall be deemed transferred to the corporation.

*Section 5.* Upon the death of any member, the membership shall pass to the personal representatives, heirs or legatees of the deceased member, but without any rights or privileges except only the right of transfer to a duly elected applicant for membership under all the provisions of the By-Laws or other rules and regulations as may be in force at the time.

The bylaws also provided for a board of trustees, the pertinent parts of the provisions with respect thereto being as follows:

## ARTICLE III

## BOARD OF TRUSTEES

*Section 1. Number, Terms of Office and Vacancies.* The property, funds and affairs of the corporation shall be managed and controlled by a Board of Trustees, consisting of three members, each of whom shall be a regular member of the corporation. The trustees shall be in classes, each class consisting of one member elected respectively for the term of 1, 2 and 3 years. At each election a successor shall be elected to the trustee whose term shall than [*sic*] be expiring. If the office of any trustee becomes vacant by reason of death, resignation, disqualification or inability to act a successor shall be elected by the members at a regular meeting or a special meeting called for that purpose to hold office for the unexpired term and/or until his successor shall have been elected and shall have qualified.

*Section 2. Powers.* The Board of Trustees shall have in addition to the power and authority expressly conferred upon it by these By-Laws the right, power and authority to exercise all such powers and to do all such acts and things as may be exercised or done by the corporation, but subject, nevertheless, to the Statutes of the State of Illinois, to the provisions of the Certificate of Organization and to the By-Laws of the corporation.

*Section 3. Removal.* Any trustee shall cease to hold office upon suspension, expulsion or upon the filing of an application by for the transfer of his membership, or he may be removed from office by a majority vote of those present at any meeting of the members of the corporation, if it shall appear that any such trustee has been and will thereafter during the balance of his term be unable to act as such trustee, or is otherwise disqualified.

\*     \*     \*     \*     \*     \*     \*

*Section 9. Quorum.* A majority of the elected and acting members of the Board of Trustees shall be necessary to constitute a quorum for the transaction of business at any meeting.

*Section 10. Informal Action.* The individual members of the Board of Trustees shall have no power as such. Except as in this section provided, the Board of Trustees shall act and shall have the capacity to act, only as a Board. Nevertheless any action taken pursuant to a prior authorization, or confirmed and approved by subsequent ratification, in writing whether of record in the corporate record book or otherwise, signed by all of the trustees, shall have and shall be deemed to have, the same force and effect as if such action had been taken in, or pursuant to a resolution adopted in a regularly called or constituted meeting of the Board of Trustees.

Charles E. Scharf died on January 25, 1943. On January 18, 1943, he wrote in handwriting upon the back of his membership certificate the following:

> For value received I hereby sell, assign and transfer unto Grace M. Scharf, all my right title and interest in and to the within certificate January 18, 1943
>
> Charles E. Scharf

The face of the membership certificate issued to Charles E. Scharf contains the following in handwriting:

Cancelled
Sept. 21, 1944
Geary V. Stibgen
    *Secretary*

Under date of September 14, 1944, a certificate was issued to Grace M. Scharf certifying that she is now a regular member of the Belmont Community Hospital Association.

Geary V. Stibgen died in 1948. There is written upon the back of the certificate issued to him the following:

I hereby transfere [*sic*] this certificate number 5 onto [*sic*] my son Robert Roy Stibgen.

Signed Frances H. Stibgen

This certificate contains a handwritten legend over its face as follows:

Cancelled
April 15, 1948
A. H. Hauber.
    *Treas*

Under date of April 15, 1948, a certificate was issued to Robert Roy Stibgen (hereinafter referred to as Robert) which certified that he is now a regular member of the Belmont Community Hospital Association.

Hauber, Comes, and Price from the original issuance of the certificates of membership in Belmont to them in 1938, Grace from the issuance of the certificate to her in 1944, and Robert from the issuance of his certificate in 1948, were the holders of these certificates and regular members of Belmont at all times until the transaction which gave rise to the instant case.

Hauber and Comes at all times from the organization of Belmont until October 30, 1953, served as two of the trustees and from a practical standpoint were the administrative officers of the hospital during this entire period. They were paid by Belmont for the services they rendered and during most of the period the compensation they received for their services was comparable to the amounts paid generally to doctors serving in a similar capacity in other hospitals.

The third trustee at the time of the organization of Belmont was Charles E. Scharf. The record is not clear as to the identity of the third trustee after Charles E. Scharf's death. Grace never performed any services for Belmont.

The balance sheet of Belmont as of January 31, 1939, showed a deficit of $4,224.07 which consisted of a net loss for the 6 months ended January 31, 1939. This balance sheet showed current assets of $28,967.41, fixed assets consisting of land, building, and furniture and equipment of $241,300.12 with a reserve for depreciation of $4,817.45, and a net value of $236,482.67. It showed goodwill valued at $91,028.48. The balance sheet showed current liabilities of $48,403.63.

Included in the current liabilities were "notes payable to stockholders (collateralized by $7,000.00 face value of Belmont Hospital First Mortgage Bonds)" in the amount of $3,500 and "liability for accrued taxes of predecessor corporation" of $21,199. The balance sheet showed bonded indebtedness of Belmont in the amount of $324,200.

The balance sheet of Belmont as of July 31, 1953, showed current assets of $153,441.04, net investment in United States Treasury bonds of $171,120.97, fixed assets consisting of land, buildings, building improvements, and furniture and fixtures of $524,388.77 with a reserve for depreciation of $213,022, and net book value of $311,366.77. The balance sheet showed as an asset, goodwill in the amount of $91,028.48. The only liabilities shown on the balance sheet of July 31, 1953, were current liabilities in the amount of $6,673.87, in which was included accrued real estate taxes of $41.82. The balance sheet as of July 31, 1953, showed a total surplus of $726,383.15 consisting of capital surplus of $53,321.70 in which was included an amount of $15,553.63 designated as "Property Tax Cancellation Increment." Operating surplus as of August 1, 1952, was shown as $582,366.22 and net income for the year ended July 31, 1953, as $90,695.23, making total operating surplus of $673,061.45.

At all times pertinent hereto Belmont operated a hospital in Chicago, and on January 9, 1939, was ruled tax exempt under the provisions of section 101(6) of the Revenue Act of 1938.

A hospital affiliation is very important to a practicing physician or surgeon. Generally, a doctor becomes affiliated with a hospital by applying first for a courtesy staff position, later for associate staff appointment, and finally a permanent staff or attending staff position. For appointment to a staff position of a hospital, a doctor must be approved by the administration of the hospital and is usually voted upon by a committee of the staff. Not all applicants are admitted. Belmont followed the practice of hospitals generally in selecting its staff doctors.

After the organization of Belmont in 1938 for an undisclosed period of time, emergency work which came to the hospital when the patient had no doctor was done 1 day a week by Price. Comes, Hauber, and Charles E. Scharf did the balance of the emergency work, each serving a week at a time.

Sometime in the late 1940's Hauber and Comes began to consider retiring from the active practice of medicine. A broker named Paul Weinberg approached them and informed them that he might be able to secure a purchaser for their membership certificates in Belmont. Weinberg then went with the two doctors to the office of Timothy G. Lowry, a practicing attorney in Chicago, for legal advice concerning the contemplated transfers. Weinberg handled the financial negotiations. Several offers, including a 1952 offer to purchase the cer-

tificates as a "package" for $300,000, were relayed through Weinberg to the doctors and to Grace, Stibgen, and Price whose consent to sell their certificates was required by all the prospective purchasers, but an agreement satisfactory to all parties did not materialize prior to 1953. Finally, through the efforts of Lowry and Weinberg, on August 27, 1953, after preliminary negotiations, an organization named Stewards Foundation (hereinafter referred to as Stewards), as purchaser, agreed with Lowry, as nominee of the certificate holders, as seller of all memberships in Belmont, to enter into a purchase contract for the five membership certificates as a package for a gross price of $710,000 (to be divided as the seller saw fit among the five certificate holders). The agreement was conditional upon all five certificates being transferred to Stewards, or its nominees, and the election of such officers and trustees as the buyer (Stewards) should designate, so as to effectively vest control of the Belmont Hospital Association and of all its property and assets relating to the conduct of the hospital but subject only to its obligations as disclosed on its books and records. The agreement also required that Stewards be furnished with a Chicago Title and Trust Company guarantee policy covering the hospital building and lands, showing good title in Belmont, a certified audit for the period ending July 31, 1953, and certificate of the officers that there were no contingent liabilities of the hospital not shown on the audit report and that the hospital association had made no unusual disbursements since July 31, 1953.

On August 28, 1953, Price and Robert, in order to carry into effect the previous day's contract with Stewards, agreed to sell their certificates for $30,000 and $20,000, respectively. These agreements were in the following form (identical except as to price) :

Chicago, Illinois
*August 28, 1953*

Mr. Timothy G. Lowry
*135 South LaSalle Street*
*Chicago, Illinois*

Dear Mr. Lowry :

I desire to sell my membership in the Belmont Community Hospital Association for the sum of $_____ net to me. To this end I have heretofore deposited with your firm my membership certificate in said Association endorsed in blank, and I deliver to you herewith my undated letter of resignation as a member, trustee and officer of said Association. Said deposits are made with you and your firm upon the following conditions :

1. You are hereby authorized to sell said membership certificate or to purchase the same for your own account and to transfer and deliver the same to the purchaser or its nominees upon such terms and conditions as you deem proper, provided that there is deposited in your firm's trust fund account for delivery to me the sum of $_____, without deduction of any kind for charges for your firm acting as a depositary hereunder for fees and commissions or other costs of sale, or any other costs and expenses whatsoever, it being expressly understood that I shall receive the sum of $_____ net.

2. You are hereby authorized to date my said letter of resignation the date when said $———— is deposited for my account, as aforesaid, and said resignation shall thereupon be delivered by you to the purchaser or its nominees, and shall become effective as of that date.

3. Promptly after the deposit with your firm of said $———— for my account and delivery by you of the membership certificate to the purchaser thereof or its nominees, you shall cause said $———— to be paid to me.

4. In the event that on or before November 1, 1953, there shall not be deposited with your firm for my account $ ———— as aforesaid, you shall return said membership certificate and resignation to me, unless I agree to an extension of time.

5. In the event said $ ———— shall be deposited with you for my account, then upon your request and before my resignation as a member, trustee and officer of the company takes effect, I agree to vote to elect the purchaser or its nominees as a member of said Association, a trustee thereof, and an officer thereof, if you so request.

6. In consideration of $1.00 and your consenting to act hereunder and of other good and valuable considerations, the receipt and sufficiency whereof I hereby acknowledge, I agree not to withdraw the deposit herewith made with your firm or to vary or modify the terms thereof and, if accepted by you, this letter agreement shall serve as an option to November 1, 1953, to yourself purchase or to sell for my account said membership on the terms above indicated.

The terms hereof shall be binding upon our respective successors in interest.

Very truly yours,

/s/ Stanley F. Price
STANLEY F. PRICE
(formerly Stanley F. Przygocki)
*4868 West Warner Avenue*
*Chicago, Illinois*
/s/ Robert R. Stibgen
ROBERT R. STIBGEN
*3260 N. Harding Avenue*
*Chicago, Illinois*

ACCEPTED:
/s/ Tim G. Lowry
TIMOTHY G. LOWRY

On the same date Hauber and Comes entered into the following agreement with Lowry:

Chicago, Illinois
*August 28, 1953*

Mr. Timothy G. Lowry
*135 South LaSalle Street*
*Chicago, Illinois*
Dear Mr. Lowry:

We have previously deposited with you our respective membership certificates in the Belmont Community Hospital Association and herewith deposit with you our resignations as members, trustees and officers of the Association. It is our understanding that Dr. Price and Mr. Stibgen have also deposited their membership certificates and resignations with you, and it is contemplated that Mrs. Scharf will do likewise.

It is our desire to sell our certificates along with all other certificates, and to this end we agree as follows:

1. You are hereby authorized to sell all memberships for the sum of $710,000.00, of which $100,000.00 shall be paid on the consummation of the sale, $200,000.00

within thirty days thereof, and the balance in not more than two years, to be secured in such fashion as you deem appropriate, with the unpaid balance to bear interest at the rate of 4% per annum, and subject to being prepaid at any time in multiples of $5,000.00.

2. Upon the sale of said memberships, from the amounts first received by you, you shall pay in full any amounts due Mrs. Scharf, Dr. Price and Mr. Stibgen, but not more than $100,000.00. From the next money received, you shall pay all costs of sale, including amounts due Paul Weinberg not exceeding the sum of $70,000.00, and the balance after the payment of such costs you shall pay to us in equal shares. All future sums received by you, less any costs of collection, shall be forthwith disbursed by you in equal shares to us, and any collateral held by you as security for the payment of the balance of the purchase price shall either be held by you as trustee for our joint account or shall be assigned in equal shares to us, or to our nominees as we may direct.

3. Upon the sale of said memberships, you are hereby authorized to date our letters of resignation the date of the sale and the same shall be effective as of that date.

4. In the event you so request and there has been executed by you a binding sales agreement, we agree to vote for the election of such members, trustees and officers of the Association as the purchaser of the membership certificates shall request, and to cause such other corporate action to be taken as shall be necessary to vest control of the Hospital Association in the purchasers.

5. In the event that no sale of said memberships is made or contracted for on or before November 1, 1953, the memberships and resignations deposited by us with you shall be returned upon our request.

6. The terms of this letter agreement shall be binding upon our respective successors in interest.

Very truly yours,

/s/ Urban V. Comes  
URBAN V. COMES  
/s/ Arthur H. Hauber  
ARTHUR H. HAUBER

ACCEPTED:  
/s/ Tim G. Lowry  
TIMOTHY G. LOWRY

Hauber, Comes, Price, and Stibgen each deposited his certificate with Lowry and gave him an undated letter of resignation to be effective when the contemplated sale was consummated. At this point it was contemplated that the net price to Hauber and Comes would be approximately $540,000 or $270,000 apiece. Of course, the final amount to be received by Hauber and Comes could not be determined until Grace agreed with Lowry as to the amount she was to receive.

It was also assumed that Grace would receive $50,000 (thereby bringing to $100,000 the proceeds of the sale to be paid to the certificate holders other than Hauber and Comes). However, Grace was recalcitrant and felt that this amount was inadequate. Consequently, in order to induce Grace to enter the transaction it was finally agreed that Hauber and Comes would assign to her $25,000 of their interest in the balance ($610,000) payable by Stewards. The interest thus assigned was to be paid from the first funds Hauber and Comes received. Upon the execution of this latter agreement, Grace, acting

through her own independent attorney, sent to Lowry an agreement dated October 17, 1953, to sell her certificate for a price of $50,000, the agreement being made expressly contingent upon her receipt of an assignment from Hauber and Comes of $25,000 of their interests in the balance of the purchase money bringing her total to be received from the transaction to $75,000. At the same time, Grace also delivered her undated letter of resignation and her agreement to vote as directed on terms identical with the agreements between Lowry and the other four members.

To give effect to the $25,000 assignment to Grace and to other costs affecting the net return to Hauber and Comes, Lowry entered into identical supplemental agreements with Hauber and Comes on October 30, 1953, whereby their shares of the amount to be received from the transaction were finally determined to be $256,666.66 each.

All five members now being amenable to the sale, Lowry (as nominee for the five selling members) and Stewards entered into a final agreement on October 30, 1953, embodying the terms outlined in the August 27 conditional agreement. The provisions of the final agreement are as follows:

Agreement made as of the 30th day of October, 1953, by and between TIM G. LOWRY, hereinafter called Seller, and STEWARDS FOUNDATION, an Illinois charitable corporation, hereinafter called Buyer.

WHEREAS, Seller controls and is authorized to sell to Buyer or its nominees five (5) memberships (being all of the existing memberships) of the Belmont Community Hospital Association, an Illinois charitable corporation (hereinafter called the Association), and

WHEREAS, Seller desires to sell and Buyer desires to buy all of said memberships on the terms and conditions hereinafter stated,

Now, THEREFORE, THIS AGREEMENT WITNESSETH, that for and in consideration of the premises and the covenants, payments and agreements hereinafter stated, the parties hereto agree as follows:

1. Seller agrees to deliver and hereby delivers to Buyer all of said memberships endorsed in blank.

2. Buyer hereby acknowledges receipt of said membership certificates and agrees to pay Seller therefor as follows:

(a) $100,000 contemporaneously with the execution hereof, the receipt of which sum is hereby acknowledged by Seller.

(b) $200,000 within forty-five (45) days of the date hereof.

(c) Within forty-five (45) days from the date hereof $410,000 principal amount first mortgage note, payable two (2) years from date, secured by real estate located in Cook County, Illinois, having an appraised value of not less than $500,000, which mortgage note shall be endorsed by Buyer without recourse, and shall bear interest from date at the rate of 4% per annum, payable semi-annually, on the principal balance remaining from time to time unpaid, with the privilege of prepayment in whole or in part at any time in multiples of $5,000.00.

3. Seller covenants that he will assume and pay all claims for commissions, fees or costs of Paul Weinberg in connection with such sale.

4. Contemporaneously herewith Seller has delivered to Buyer the following:

(a) Resignations of Urban V. Comes, Arthur H. Hauber, Stanley F. Price

(formerly Stanley F. Przygocki), Robert R. Stibgen and Grace M. Scharf, as members, trustees and officers of said Association, and Seller hereby covenants that said persons are all of the members, trustees and officers of said Association.

(b) Affidavit of Urban V. Comes and Arthur H. Hauber that there are no claims against said Association not disclosed in the audit report as of July 31, 1953, except those incurred in the usual course of business, and that since July 31, 1953, there have been no disbursements of funds or property of said Association other than those made in the usual course of business.

5. Seller covenants that the delivery of said certificates and other documents hereinabove mentioned effectively vests in Buyer and its nominees control of said Association, its property, business and affairs, subject to its liabilities as disclosed in its books and records.

6. If Buyer shall fail to make the payment hereinabove provided in 2(b) and deliver the mortgage note hereinabove provided in 2(c) to Seller, Buyer covenants to forthwith transfer and assign or to cause to be transferred and assigned to Seller or his nominees said membership certificates and to do or cause to be done such other acts and things as may be necessary to vest in Seller or his nominees full control of the assets, property and business, subject to its liabilities, of said Association.

IN WITNESS WHEREOF, the parties hereto have executed this instrument as of the day and year first above written.

/s/ Tim G. Lowry  
TIM G. LOWRY  
SELLER  

STEWARDS FOUNDATION  
By /s/ William G. McCartney  
President  
BUYER

ATTEST:  
/s/ Donald M. Taylor  
Asst. Secretary

Upon execution of this agreement Stewards paid Lowry $90,000; and $10,000 which had been deposited in an escrow fund when the August 27, 1953, agreement was entered into was released and paid over to Lowry. Of the $100,000 so received, $20,000 was distributed to Stibgen, $30,000 to Price, and $50,000 to Grace.

A meeting of the members and trustees of Belmont Community Hospital Association was held on October 30, 1953, and the minutes thereof are as follows:

A meeting of members and trustees of Belmont Community Hospital Association was held October 30, 1953.

All members and trustees waived notice of the time, place and purpose of the meeting, which waiver is signified by the signature of each of them to these minutes.

It was stated that the purpose of the meeting was to elect new members and trustees. Thereupon, on motion duly made, seconded and unanimously carried, the following persons were duly nominated and unanimously elected as members and trustees of the Belmont Community Hospital Association to act as such until the next annual meeting of the Association or until their successors are duly elected and qualified:

William G. McCartney  
Paul W. Erickson  
James G. Humphrey  
Clyde H. Dennis  
Donald M. Taylor

Thereupon, on motion duly made, seconded and carried, said meeting was adjourned.

ROBERT R. STIBGEN
*Secretary*

APPROVED:
ARTHUR H. HAUBER
URBAN V. COMES
ROBERT R. STIBGEN
GRACE M. SCHARF
STANLEY F. PRICE
By Arthur H. Hauber and Urban V. Comes.

Lowry delivered the five certificates and resignations to Stewards. On December 7, 1953, $200,000 was paid to Lowry, and $25,000 of this amount was disbursed to Grace, $60,166.67 in cash was disbursed to each Hauber and Comes, and the balance went to Lowry's law firm ($12,999.99) and to Weinberg ($41,666.67). The $300,000 paid to Lowry in 1953 under the agreement of October 30, 1953, was from moneys of Stewards. A real estate mortgage from Belmont to Stewards, secured by Belmont property, was assigned by Stewards to Lowry. Stewards also gave a first mortgage note to Lowry. Upon completion of the payment of $410,000 to Lowry, he reassigned to Stewards both the mortgage and the note. The balance owing to Hauber and Comes, $196,500 each, was to be paid to them on or before December 20, 1955, as payments on the $410,000 note were made to Lowry. These amounts were paid in 1954 and 1955 which years are not before us.

Grace reported the $75,000 received by her in 1953 as a long-term capital gain on her income tax return for that year.[3]

Grace filed an estimated tax return for 1953 and estimated her liability for that year to be $150. Her 1953 return showed a tax liability of $19,733.67.

On their 1953 income tax returns, Hauber and Comes each reported only the cash received in that year and treated the amount reported as long-term capital gain.

Respondent in his notice of deficiency to Grace determined that she had received ordinary income in the year 1953 from the transaction here involved in the amount of $75,000 with the following explanation:

(a) You received cash and/or other property in the amount of $75,000.00 from the Stewart [sic] Foundation which is determined to be a distribution of earnings of the Belmont Community Hospital Association, and/or compensation for services rendered to the Belmont Community Hospital Association as ordinary income pursuant to section 22(a) and 115 of the Internal Revenue Code of 1939. See contra adjustment (b), below.

(b) You reported a long-term capital gain in the amount of $75,000.00 upon the alleged sale of a membership in the Belmont Community Hospital Associa-

---

[3] None of petitioners contends that the memberships or certificates had a basis other than zero.

tion. Inasmuch as the entire amount received by you from the Stewart [*sic*] Foundation has been determined to constitute ordinary income, your net income has been reduced by the amount of the net long term capital gain taken into consideration, viz., $37,500.00. See contra adjustment (a) above.

Respondent also determined an addition to Grace's tax under section 294(d)(2) for substantial underestimation of estimated tax.

In his notice of deficiency to each Hauber and Comes, respondent determined that each of them had received ordinary income in the year 1953 from this transaction in the amount of $256,666.66, the explanation in each instance being as follows:

(a) You received cash and other property in the amount of $256,666.66 from the Stewart [*sic*] Foundation which is determined to be a distribution of earnings of the Belmont Community Hospital Association and/or compensation for services rendered to the Belmont Community Hospital Association and taxable to you as ordinary income pursuant to sections 22(a) and 115 of the Internal Revenue Code of 1939. See contra adjustment (b) below.

(b) You reported a long-term capital gain in the amount of $60,166.00 upon the alleged sale of a membership in the Belmont Community Hospital Association. Inasmuch as the entire amount received by you from the Stewart [*sic*] Foundation has been determined to constitute ordinary income, your net income has been reduced by the amount of the long-term capital gain taken into consideration, viz., $30,083.00. See contra adjustment (a) above.

Respondent, by amended answer filed in each case, asserted that the membership certificates in Belmont did not constitute property and were therefore not capital assets, and in the alternative as to Hauber and Comes, that if the amount received by them was from the sale of a capital asset, three-fifths thereof represented short-term capital gain.

OPINION.

In order to be entitled to the more favorable tax rates applicable to long-term capital gains, there must first be a "capital asset" and second, a sale or exchange of that asset. *Commissioner* v. *Gillette Motor Co.*, 364 U.S. 130 (1960). Section 117(a) of the Internal Revenue Code of 1939 defines capital asset as "property held by the taxpayer" with certain exceptions not here pertinent.

Petitioners in the instant case reported the amounts received by them from the transaction with Stewards as long-term captial gains and respondent in his notice of deficiency determined that such amounts constituted ordinary income. Petitioners contend that since respondent in his deficiency notices assigned as his reasons for his determination that the amounts received were distributions of earnings of Belmont or compensation for services rendered, the burden is on respondent to establish the assertion in his amended answer that the membership certificates in Belmont were not property. The issue here is whether the amounts received by petitioners were capital gains as reported by them. Respondent having determined that the

amounts received were ordinary income, the burden of proof on this issue rests on petitioners even though the reason assigned or theory advanced by respondent for his determination that such receipts were ordinary income and not capital gains in his notice of deficiency might have been erroneous. *Standard Oil Co.*, 43 B.T.A. 973, 998–999 (1941), affd. 129 F. 2d 363 (C.A. 7, 1942), certiorari denied 317 U.S. 688. The respondent's amendment to his answer to rely specifically on the theory that the membership certificates were not property does not constitute the pleading of new matter as to which the burden of proof is upon him. There is no inconsistency between his determination and his amended answer. Inherent in his determination was the determination that there was not the sale of a capital asset. *C. D. Spangler*, 32 T.C. 782, 793 (1959), affd. 278 F. 2d 665 (C.A. 4, 1960).

There is nothing in the record to establish that the membership certificates in Belmont were property. The clear import of the by-laws is that the certificates, insofar as they evidence membership in Belmont, granted a privilege to and imposed a responsibility upon the holders to serve a charitable institution.[4]

Petitioners contend that the membership certificates in Belmont assured the holders thereof, if doctors, of a valuable affiliation with a hospital, and imply that such a valuable affiliation might not be available to other doctors.

It is to be noted that the evidence shows that generally doctors apply for affiliation with a hospital, are approved by the administration, and voted on by a committee of the staff. Comes testified that this was the practice followed by Belmont. There is no indication from Comes' testimony that the administrators of Belmont preferred themselves to other doctors on the staff or derived any personal benefit from approving applications of doctors for staff positions. One of the

---

[4] The bylaws of Belmont distinguish between membership certificates and membership in Belmont. From the bylaws it appears that while a membership certificate might be assigned or devised, the recipient thereof could acquire membership only by being elected thereto by the trustees. Under Illinois law, the obtaining of a membership certificate by assignment in a not-for-profit corporation does not entitle the holder to membership unless elected thereto in accordance with the bylaws of the association. *American Live-Stock Com'n Co.* v. *Chicago Live-Stock Exch.*, 143 Ill. 210, 32 N.E. 274 (1892), and *W. G. Press & Co.* v. *Fahy*, 313 Ill. 262, 145 N.E. 103 (1924). This fact, itself, negates that the membership certificates are property. However, both parties refer to the membership certificates and memberships in Belmont as being indistinguishable and we will therefore treat the membership certificates as representing memberships in Belmont. The bylaws of Belmont also show that the only function of the members after being elected to membership is to elect the trustees. All the duties in connection with the operation of the hospital rest with the trustees. It is clear that the trustees are limited to actions in accordance with the charter and bylaws of Belmont and the statutes of Illinois. Ill. Ann. Stat., ch. 32, sec. 163 (Smith-Hurd), provides for the "general not for profit corporations." Not all such corporations are charitable corporations. In the case of charitable corporations the trustees are obligated to use the funds of the corporation and to operate the corporation solely for the charitable purpose set forth in its charter. *Northwestern University* v. *Wesley Memorial Hospital*, 290 Ill. 205, 125 N.E. 13 (1919); *Holden Hospital Corp.* v. *Southern Ill. Hosp. Corp.*, 22 Ill. 2d 150, 174 N.E. 2d 793 (1961).

purposes for which Belmont was organized was to render by all means necessary or expedient comprehensive and complete service to physicians.[5] There is no evidence to show that the members of Belmont or its trustees obtained any preferred treatment from the hospital by reason of such positions or that they would not have been violating their trust to have obtained such preference.

Comes and Hauber were paid for their services as administrators of the hospital but there is no indication that it was the position of administrator of the hospital and compensation therefrom which petitioners purported to be transferring to Stewards.[6] We have also found that at least at some time in the beginning of the operation of Belmont as a charitable hospital, the three doctors who were trustees served a week at a time doing the emergency work when a patient came into the hospital without his own doctor. The record does not show how long this continued. The testimony with respect to this arrangement came from Grace whose husband died in 1943 and not from Comes who was connected with the hospital as one of the trustees up until the transaction here involved. If there did exist some agreement that the trustees as the administrators of the hospital were to perform these services and receive the income therefrom, there is no indication in the record that it was this agreement to receive income from such services which was being transferred to Stewards. In any event an assignment of an agreement to receive income from services performed as an administrator of Belmont or from services to emergency patients would be an assignment of a right to perform services for compensation. Amounts received from such a transfer would not constitute capital gains. *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260 (1958); *Nelson Weaver Realty Co.*, 35 T.C. 937 (1961). Cf. *Estate of Mabel K. Carter*, 35 T.C. 326 (1960), affd. 298 F. 2d 192 (C.A. 8, 1962).

The evidence in this case fails to show that the membership certificates were property.

Since the membership certificates transferred by petitioners to Stewards were not property, the amounts received by them from Stewards were not capital gains from the sale or exchange of a capital

---

[5] In order to retain its status as a charitable corporation in Illinois it was necessary that Belmont be operated for the charitable purposes set forth in its charter and not for the private gain or profit of any person connected with the institution. *People* v. *Southern Illinois Hospital Corp.*, 404 Ill. 66, 88 N.E. 2d 20 (1949). If the trustees operated Belmont so as to restrict the use of its facilities to themselves and their selected associates, Belmont would not under the Federal tax law be considered to operate exclusively for charitable purposes. *Lorain Avenue Clinic*, 31 T.C. 141 (1958). Cf Rev. Rul. 56–185, 1956–1 C.B. 202.

[6] The Illinois statutes, while providing that no dividends shall be paid by a not-for-profit corporation and no part of the income of such a corporation shall be distributed to its members, directors, or officers, specifically provide that a corporation may pay compensation in a reasonable amount to members, officers, or directors for services rendered. (Ill. Ann. Stat., ch. 32, sec. 163a25 (Smith-Hurd)). This provision is applicable to both charitable and other not-for-profit corporations.

asset under section 117 of the Internal Revenue Code of 1939. Even if the membership certificates could be considered property in the hands of petitioners, it would not necessarily follow that the amounts received from the transfer thereof constituted capital gains. In the instant case the only information that we have with respect to Stewards is that stated in the agreement entitled "Purchase and Sales Agreement," in which it is designated as an Illinois charitable corporation.[7] If we accept this statement as showing that Stewards was an Illinois charitable corporation, then under Illinois law it would be permitted to disburse its funds only in furtherance of the charitable purposes for which it was organized. *Holden Hospital Corp.* v. *Southern Ill. Hosp. Corp.*, 22 Ill. 2d 150, 174 N.E. 2d 793 (1961), and *Northwestern University* v. *Wesley Memorial Hospital*, 290 Ill. 205, 125 N.E. 13 (1919).

There is no showing in the record of the purpose for which Stewards was organized in order that any determination may be made whether it might properly disburse funds in a transaction of the type consummated here. It is to be noted that the persons elected to membership as the nominees of Stewards were apparently its officers. Under the Illinois law, Stewards being a charitable corporation was not entitled to disburse its funds for the benefit of its officers and directors. While it is conceivable that the officers and directors of Stewards, if physicians, might personally derive some benefits from an affiliation with a hospital or from payments received by them as administrators thereof for services rendered to the hospital or to patients who came to the hospital unattended by a doctor, there is no indication of any manner in which the charitable corporation, Stewards, which it has been stipulated paid out the original $300,000, could obtain any benefit from the transfer to its nominees of the membership certificates in Belmont. Cf. *Leh* v. *Commissioner*, 260 F. 2d 489, 493 (C. A. 9, 1958), affirming 27 T.C. 892.

If the benefit Stewards hoped to obtain from its payment for the transfer of the membership certificates was some form of equitable ownership of the properties and goodwill of Belmont, petitioners were not the owners of any such equity and therefore could not properly transfer any such equitable ownership. Belmont owned the properties and they were dedicated to use as a charity under Belmont's charter and bylaws. If a payment had been made by Stewards directly to

---

[7] There is also in the evidence a letter on a letterhead of Stewards Foundation, Inc., that contains the following list of officers and directors:

Wm. G. McCartney, president.
Paul W. Erickson, secretary.
James G. Humphrey, treasurer.
Clyde H. Dennis, director.
Donald M. Taylor, vice president.

Belmont for its properties including its goodwill,[8] the amount received by Belmont would have been impressed with a trust requiring that it be used for the charitable purposes for which Belmont was organized or distributed to a charitable use similar to that for which Belmont was organized. Ill. Ann. Stat., ch. 32, sec. 163a44(c) (Smith-Hurd), and *Holden Hospital Corp.* v. *Southern Ill. Hosp. Corp., supra.*

From the instruments surrounding the transfer here involved, an inference arises that the amount paid by Stewards was paid for the purpose of acquiring effective control of the properties and assets of Belmont.[9] In substance what has occurred is as much a distribution of all or a substantial portion of the properties and assets of Belmont to the petitioners as if a direct sale of those properties had been made and the moneys distributed to petitioners.

Belmont was exempted from Federal income tax under section 101(6) of the Revenue Act of 1938 which is the predecessor of section 101(6) of the Internal Revenue Code of 1939 which exemption entitled any person making a contribution or donation to it to deduct such contribution or donation in computing his income tax. (Sec. 23(o)(2), I.R.C. 1939.)

The record is silent as to what donations, if any, the general public had contributed to the assets which Belmont had on October 30, 1953. It is certainly clear by the net income shown for the year ended July 31, 1953, that some of Belmont's surplus was created because of its exemption from Federal income tax.

A comparison of the January 31, 1939, balance sheet of Belmont which shows a $21,000 liability for accrued taxes of the predecessor business corporation with the balance sheet of July 31, 1953, which shows as a part of surplus a property tax cancellation increment of $15,553.63 indicates that at least some of Belmont's property was exempted from State taxes. Cf. *People* v. *Southern Illinois Hospital Corp.*, 404 Ill. 66, 88 N.E. 2d 20 (1949); and *People* v. *Alpha Pi of Phi Kappa Sigma Educational Ass'n*, 326 Ill., 573, 158 N.E. 213 (1927).

---

[8] It will be noted that Belmont carried as an asset goodwill valued at $91,000 both on its January 31, 1939, balance sheet and its July 31, 1953, balance sheet, and Stewards required as a part of the purchase agreement that Comes and Hauber guarantee the liabilities and assets of Belmont as shown on its July 31, 1953, balance sheet to be accurately stated.

[9] The agreement of August 27, 1953, required that a certified audit report of Belmont's financial condition as of July 31, 1953, be furnished Stewards and affidavits of the officers of Belmont as to no other obligations existing. Also note the provisions of paragraphs 4(b) and 5 of the Purchase and Sales Agreement of October 30, 1953, set forth in our findings. The evidence that there had been previous offers to purchase the certificates, one from a group of doctors for $300,000, is no indication that it was the certificates that Stewards sought. The terms of the other offers are not in evidence and it may well be that they also were offers to buy control of the hospital properties.

It is thus apparent that some of the properties owned by Belmont were acquired, if not by direct donation by the public to a charitable institution, at least indirectly through the tax-exempt benefit conferred by Federal and State law.[10]

We do not have before us a question of the legality under Illinois law of petitioners' indirectly appropriating for their personal benefit that which they were not permitted to distribute directly to themselves and therefore do not pass upon the question. We do have the question whether the amounts received from such a transaction come within the preferential treatment for Federal tax purposes provided by section 117 of the Internal Revenue Code of 1939 and hold that they do not. Section 117 is an exception from the normal requirements of the Internal Revenue Code and is to be narrowly applied. *Corn Products Refining Co.* v. *Commissioner*, 350 U.S. 46 (1955).

The contention of Hauber and Comes that the amounts received in excess of $60,166.67 each are not includible in income in the year 1953 is based primarily upon their position that the amounts were proceeds from the casual sale of personal property entitled to be reported under section 44(b) of the Internal Revenue Code of 1939 on an installment basis. Having determined that the amounts received were not as the result of a sale of property, it is not necessary to pass upon the precise contention made by Hauber and Comes. However, since Hauber and Comes were cash basis taxpayers, there is includible in their income for the year 1953 only such amount as they received in that year in cash or property, any property received being included at its fair market value. At the end of 1953 there remained to be paid under Stewards' contract with Lowry the amount of $410,000. The indebtedness was evidenced by a 4-percent first mortgage note of short maturity. The note was not introduced in evidence, but there is certainly no evidence from which we may assume that the note was nonnegotiable or that its fair market value was less than its face value.

Respondent in his notice of deficiency to Hauber and Comes treated the full amount received by them as income in 1953. This constituted a determination that the note had a fair market value of its face amount and was a cash equivalent when received, and this determination is presumptively correct. We, therefore, hold that this note was a negotiable note of a fair market value of its face amount and was the equivalent of cash. *Harry Leland Barnsley*, 31 T.C. 1260 (1959).

It is clear that 80 percent of Grace's correct tax liability for 1953 and, in fact, even 80 percent of the tax as reported on her return for

---

[10] It will be noted from a comparison of Belmont's 1939 and 1953 balance sheets that its bonded indebtedness which existed on January 31, 1939, did not exist on July 31, 1953, and that the net basis of its buildings and equipment had substantially increased even though there had been an increase in the reserve for depreciation, indicating that a number of capital improvements had been made during this period.

that year, exceeds her estimated tax of $150. She is therefore liable for the addition to tax for substantial underestimation of estimated tax in accordance with section 294(d)(2) of the Internal Revenue Code of 1939.

Reviewed by the Court.

*Decision will be entered for the respondent.*

---

RAUM, *J.*, concurring: We have before us a cynical transaction of highly doubtful morality. It is difficult to believe that the Illinois laws providing for the creation of the charitable organization here involved were ever intended to generate property interests in the hands of these petitioners which could be the subject of traffic for gain. The privilege of serving the charitable institution embodied in the so-called certificates of membership was not a property right susceptible of being bartered in the market place like shares of corporate stock. Such "certificates" were wholly unlike certificates of corporate stock which reflect a property interest in the corporate enterprise and an equity in its assets. Petitioners had no property rights whatever with respect to the charity, and they simply relinquished their memberships in circumstances assuring the acceptance of others as members in their place. Whether the large sums of money involved were paid merely for the privilege of obtaining lucrative association with the charity in the practice of medicine or whether the so-called purchasers intended in some undisclosed manner to benefit privately or otherwise from the assets or substantial surplus of the charity are matters upon which it is not necessary to speculate. The point is that petitioners had no property rights to sell within the meaning of the capital gains provisions.

Not everything that is "sold" is "property" within the meaning of these provisions. As was stated in this connection in *Miller* v. *Commissioner*, 299 F. 2d 706 (C.A. 2, 1962), affirming 35 T.C. 631, "many things can be sold which are not 'property' in any sense of the word. One can sell his time and experience, for instance, or, if one is dishonest, one can sell his vote; but we would suppose that no one would seriously contend that the subject matter of such sales is 'property' as that word is ordinarily understood." Similar considerations are pertinent here. No part of the profit realized in this case was attributable to the sale of a "capital asset," a term which must be "narrowly" construed. *Corn Products Co.* v. *Commissioner*, 350 U.S. 46, 52. The entire gain was ordinary income, and not capital gain. A contrary view would make sweet indeed the uses of charity.

TIETJENS and WITHEY, *JJ.*, agree with this concurring opinion.

---

FORRESTER, *J.*, dissenting: I must dissent from the holding of the majority as to the rights or property for which Stewards paid $300,000 of its own money in 1953. As to the $410,000 balance which was discharged through the issuance of a note secured by a mortgage upon Belmont real estate and then paid in later years presumably out of hospital funds or earnings, it is clear that this amounted to distributions taxable at ordinary income rates since the note was a cash equivalent.

Returning now to what was purchased for the $300,000: It seems clear to me that the rights and privileges expressly granted by each of the five membership certificates in effect constitute the "member" a trustee of a charitable organization and are really more in the nature of further definitions of the duties imposed by said certificates to serve the public within the areas outlined by the charter grant of the charitable organization. However, when all five (100 percent) of the certificates are considered collectively it becomes apparent that a new right and privilege has come into being for now the five members acting in concert can direct and control the policies and direction of the hospital.

This new right is not opposed to or in derogation of the duties imposed by the individual certificates for it cannot be assumed that the concert action of the five will be detrimental to the charitable, public purposes of the hospital. On the contrary, it must be assumed that the concert action of the five will be to the best interests of the hospital, for only that character of action will preserve and even augment those valuable intangible rights which have come into being and grown up around the certificates.

These intangible rights which have grown valuable are the rights to designate the doctor-members of the hospital staff, thus affording the doctor certificate holders with a good and desirable hospital facility for their patients and prospective patients. Obviously, if inferior or incompetent doctors were placed upon the hospital staff or if the hospital were operated *in any manner other than in the best interests of the public*, it would thereby become undesirable, lose its good reputation, and no longer attract unattended patients or be acceptable to the patients of the doctor certificate holders.

Thus, the interests of the five certificate holders and of the objects of the charity are identical—that the hospital be operated in a good and workmanlike manner.

We have long held that intangible property rights can exist, separate from, but in connection with definitive rights, i.e., unexpired terms of leaseholds, and that when sold they result in capital gains or losses. *Walter H. Sutliff*, 46 B.T.A. 446 (1942) ; *Isadore Golonsky*, 16 T.C. 1450 (1951), affd. 200 F. 2d 72 (C.A. 3), certiorari denied

345 U.S. 939; and *Louis W. Ray*, 18 T.C. 438 (1952), affd. 210 F. 2d 390 (C.A. 5), certiorari denied 348 U.S. 829.

We have also considered one situation in which these valuable intangible rights came into being apart from and even in spite of the written lease. In *McCue Bros. & Drummond, Inc.*, 19 T.C. 667 (1953), affd. 210 F. 2d 752 (C.A. 2), certiorari denied 348 U.S. 829, the lease had expired under its terms on January 31, 1946, but New York rent control laws were then in effect under which the tenant had conditional rights to remain in possession. This right was surrendered and sold to lessor for $22,500, which amount tenant returned as long-term capital gain. Respondent contended for ordinary income treatment, arguing, *inter alia*, that tenant had no property interest in the premises, that the transaction was not a sale or exchange but an extinguishment and disappearance of any rights that might have existed, and that such rights had not grown out of and were not connected with the written lease. We and the Court of Appeals held that a right did exist and that it was a property right, allowing the long-term capital gains treatment. Judge Augustus Hand said, in part, at page 753:

Whether the property is held under a lease or by virtue of the Rent Control Laws seems immaterial; in both cases the lessee or tenant has the right to the possession and use of the premises as long as he continues to pay the rent.

The Commissioner attacks the Golonsky decision on the ground that it is inconsistent with recent decisions of this court holding payments made for the release of contractual rights, such as the right to an exclusive agency, to be ordinary income. [Cases cited.] In these cases no "sale or exchange" within the meaning of the statute was found because the contractual right was not transferred, but was released and merely vanished. However, we think the right of possession under a lease or *otherwise*, is a more substantial property right which does not lose its existence when it is transferred. If it is sold by the tenant to a third person, the gain derived therefrom is a capital gain, * * * [Emphasis supplied.]

Thus in *McCue* and in *Scharf*, the rights are not an express part of the written instrument but arose surrounding it. In *McCue* they arose because of a new State statute. In *Scharf* they arose because of the good and efficient operation of Belmont Hospital through the years in serving the needs of the public.

The parallel is near perfect. It is indeed harsh to reward the taxpayer who was the lucky recipient of a property right created by an emergency wartime statute and penalize the taxpayer whose efforts (or the efforts of his predecessors in interest) created these intangible property rights surrounding the Belmont memberships by well serving the public.

FAY, *J.*, agrees with this dissent.

DRENNEN, *J.*, dissenting: I respectfully disagree with the majority opinion insofar as it holds that the $300,000 paid to the certificate holders by Stewards is not taxable as long-term gain on the sale or exchange of a capital asset. I agree that the remaining $410,000 received by the certificate holders which was paid out of funds of Belmont should be taxable as ordinary income.

The majority concludes that the entire amount received by petitioners was ordinary income because petitioners failed to show that what they sold to Stewards was "property" within the meaning of section 117(a), I.R.C. 1939. In my opinion the majority relies too heavily on petitioners' failure to carry their burden of proof, under the circumstances of this case. When the Commissioner in his notice of deficiency determines that petitioners received ordinary income from the transaction with the explanation that the cash or property received from Stewards is determined to be a distribution of earnings of Belmont and/or compensation for services rendered to Belmont, and then in an amended answer asserts in the alternative and for the first time that the membership certificates in Belmont did not constitute property and were therefore not capital assets, I am very doubtful that any presumption of correctness should attach to the latter assertion. If the transaction was a sale, and it would appear to be, absent any finding that it was a sham, and the $300,000 was from money of Stewards, as has been stipulated, then that amount would not be a distribution of earnings of Belmont nor compensation for services rendered to Belmont. When the Commissioner asserts what to me seems to be a new and inconsistent claim by amended answer, I do not think the allegations of the amended answer should be presumed to be correct or that the petitioners have the burden of proving them wrong.

But in any event, we have in evidence the charter and bylaws of Belmont and evidence as to what rights and duties ownership of all five certificates would provide. From this I think it is clear that by acquiring all five membership certificates Stewards acquired control of Belmont, its physical plant, and all other benefits that might attach to such control. Stewards was willing to pay $300,000 of its own funds for this, and it would appear that it got its money's worth.

I agree with Judge Forrester that the membership certificates and the intangible rights which attached to them were property within the meaning of section 117(a), and they are no less so because the use of them by petitioners in this manner and for purposes of gaining a profit therefrom might be in violation of Illinois law.

OPPER and FORRESTER, *JJ.*, agree with this dissent.