ESTATE OF MABEL K. CARTER, DECEASED, GILBERT CARTER, EXECUTOR, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 80005–80010, 80042. Filed November 25, 1960.

*Gilbert Carter, Esq.,* for the petitioners.
*H. Tracy Huston, Esq.,* for the respondent.

---

[4] See *Voss* v. *Wiseman,* 234 F. 2d 237 (C.A. 10).

[1] Proceedings of the following petitioners are consolidated herewith : Estate of Emma M. Vollrath, Deceased, Gilbert Carter, Executor, Docket No. 80006; Gilbert Carter and Virginia Carter, Docket No. 80007; Patricia Carter, Docket No. 80008; Howard Carter, Docket No. 80009; Susan Carter, Docket No. 80010; David C. Carter and Frances M. Carter, Docket No. 80042.

Tietjens, *Judge:* The Commissioner determined the following deficiencies in income tax:

| Docket No. | Name of petitioner | Year | Income tax |
|---|---|---|---|
| 80005 | Estate of Mabel K. Carter, Deceased, Gilbert Carter, Executor | 1955 | $4,550.77 |
| 80006 | Estate of Emma M. Vollrath, Deceased, Gilbert Carter, Executor | 1955 | 1,626.05 |
| 80007 | Gilbert Carter and Virginia Carter | 1955 | 667.83 |
|  |  | 1956 | 2,389.34 |
| 80008 | Patricia Carter | 1955 | 531.22 |
|  |  | 1956 | 700.88 |
| 80009 | Howard Carter | 1955 | 539.05 |
|  |  | 1956 | 691.30 |
| 80010 | Susan Carter | 1955 | 526.64 |
|  |  | 1956 | 693.43 |
| 80042 | David C. Carter and Frances M. Carter | 1955 | 1,200.43 |
|  |  | 1956 | 7,339.29 |

For the year 1955 in Docket Nos. 80005 and 80006 and for the year 1956 in Docket Nos. 80007 and 80042, petitioners claim overpayments in unspecified amounts.

There are two issues to be decided. The first is whether certain sums received by petitioners as distributions from a trust, which sums arose from the settlement of litigation under the antitrust laws, were taxable as ordinary income or long-term capital gains.

The second issue is whether certain of the petitioners are entitled to deduct from gross income included in their returns, the adjusted basis of their beneficial interests in the trust to which interests they succeeded by bequest.

FINDINGS OF FACT.

The stipulated facts are so found and are included herein by reference.

Mabel K. Carter, who resided at Nevada, Missouri, died on May 18, 1954. Emma M. Vollrath, a resident of Nevada, Missouri, died on June 20, 1953. On July 7, 1954, the Probate Court for Vernon County, Missouri, granted letters testamentary in the Estate of Mabel K. Carter, Deceased, and the Estate of Emma M. Vollrath, Deceased, to Gilbert Carter. Fiduciary income tax returns for the taxable year 1955 were filed for these estates with the district director of internal revenue at Kansas City, Missouri.

Gilbert Carter and Virginia Carter, the petitioners in Docket No. 80007, are husband and wife residing at Radio Springs Park, Nevada, Missouri. They filed joint income tax returns for the taxable years 1955 and 1956 with the district director at Kansas City, Missouri.

Patricia Carter, Howard Carter, and Susan Carter, the petitioners in Docket Nos. 80008, 80009, and 80010, respectively, are individuals residing in Radio Springs Park, Nevada, Missouri. They each filed individual income tax returns for the taxable years 1955 and 1956 with the district director at Kansas City, Missouri.

David C. Carter and Frances M. Carter, the petitioners in Docket No. 80042, are husband and wife residing in Radio Springs Park, Nevada, Missouri. They filed joint income tax returns for the taxable years 1955 and 1956. Their return for 1955 was filed with the district director at St. Louis, Missouri, and their return for 1956 with the district director at Kansas City, Missouri.

On September 15, 1940, Mabel K. Carter, the owner of an undivided one-half interest in the Liberty and Sedalia Theatres in Sedalia, Missouri, in partnership with Charles T. and Olga Sears, who owned the other one-half interest in the theaters, commenced the business of exhibiting motion pictures at the Liberty Theatre. On November 7, 1940, the partnership was dissolved, and Charles T. Sears and his wife, Olga, transferred their interest in the two theaters to Mabel K. Carter, who, as sole owner, continued to operate the Liberty Theatre until May 14, 1941. On that date she ceased operation because the business was suffering losses, and leased the Liberty Theatre along with the Sedalia Theatre to Fox Ozark Theatre Corporation.

In a declaration of trust executed on October 21, 1952, Mabel K. Carter irrevocably assigned to herself as trustee the following property:

All my claims and all my rights and causes of action against—
  20th Century-Fox Film Corporation,
  Paramount Pictures, Inc.,
  Loew's Incorporated,
  RKO Radio Pictures, Inc.,
  Warner Brothers Pictures, Inc.,
  Warner Brothers Picture Distributing Corporation,
  Columbia Pictures Corporation,
  Universal Film Exchanges, Inc.,
  United Artists Corporation,
and any other persons, corporations or entities whatsoever, or against any one or more of them, that are based upon or relate to or have arisen or resulted from any combination or combinations, conspiracy or conspiracies, or act or acts unlawful under, prohibited by or in violation of any provision or provisions of the Anti-Trust laws of the United States or of the State of Missouri or of any other state; including, but not limited to, every claim and every right or cause of action that I have under Chapter 1 of Title 15 United States Code. This trust shall embrace also such funds and other property as I, by deed or act hereafter, shall add to the corpus hereof; likewise such funds and property as any other person or persons hereafter shall give, transfer or convey to the trustee (or any substitute or successor trustee) hereunder for addition to the said trust corpus.

Article VII of the declaration of trust provided as follows:

INCOME—DISTRIBUTION AND ACCUMULATION—As used herein the term "distributable income" shall mean, in general, gross income of the trust less all such costs, expenses, losses and other items (except amounts distributable to beneficiaries) as are deductible from its gross income in arriving at its net income, taxable to the fiduciary, for Federal income tax purposes. All dis-

tributable income for each taxable year of the trust shall be distributed currently, by payment or credit within such year, to the persons thereunto entitled, in accordance with the respective beneficial interests set forth in Article VI hereof; but the trustee may withhold such distribution of, and accumulate, all or any part of David Carter's share of such income for each such taxable year of the trust and distribute to the person or persons thereunto entitled under Article VI hereof, on a date subsequent to but not later than two years after the close of such taxable year (and in no event later than the date of termination of the trust and final distribution under Article VIII hereof) such share so accumulated or the part thereof so accumulated, less an amount determined by the trustee to equal income taxes paid or incurred by the trust in respect thereof.

Under the declaration of trust Mabel K. Carter, Emma M. Vollrath, and the petitioners in Docket Nos. 80007 to 80010, inclusive, and 80042 acquired vested beneficial interests in the property, corpus and income of the Mabel K. Carter Trust, as follows:

| Name of beneficiary | Percentage of interest |
| --- | --- |
| Mabel K. Carter | 20 |
| Emma M. Vollrath | 10 |
| Gilbert Carter | 2 |
| Virginia Carter | 3 |
| Patricia Carter | 5 |
| Howard Carter | 5 |
| Susan Carter | 5 |
| David Carter | 10 |

On December 9, 1952, Mabel K. Carter, trustee, filed a complaint (Civil Action No. 7940) entitled "Complaint for Treble Damages Under the Anti-Trust Laws of the United States" against Twentieth Century-Fox Film Corporation, Wesco Theatres Corporation, Loew's Incorporated, Paramount Film Distributing Corporation, United Paramount Theatres, Inc., RKO Radio Pictures, Inc., Warner Bros. Pictures Distributing Corporation, United Artists Corporation, Columbia Pictures Corporation, and Universal Film Exchanges, Inc. This complaint was filed in the United States District Court for the Western District of Missouri, Western Division.

The complaint which is included herein by this reference, was "filed under Section 4 of the Act of Congress of October 15, 1914, commonly known as the Clayton Act (Title 15, Section 15, U.S.C.A.), to recover treble damages, attorneys' fees, costs and expenses" for and on account of unlawful acts, contracts, combinations, etc., in restraint of trade.

The complaint alleged many acts of the defendants in violation of the antitrust acts and sought to recover damages suffered by Mabel K. Carter as owner and operator of the Sedalia and Liberty Theatres, which said property had been injured and damaged by reason of things done by the defendants and their coconspirators forbidden in the antitrust laws of the United States.

Among other things, the complaint alleged that because—

the continued and growing operating losses resulting from the unlawful conduct and activities of defendants and their co-conspirators threatened ultimate loss of her entire property, business and investment and being, on account of such unlawful activities and conduct of defendants and their co-conspirators, unable to sell said properties at a fair and reasonable price and unable to lease same at a fair and reasonable rental, she was compelled to capitulate to Fox and to surrender, abandon and give up her right to operate said business and property in a free, open and competitive market and to thus earn the reward and profits which said business and properties were capable of earning and producing and which, except for such unlawful conduct of defendants and their co-conspirators would have been earned and received by her. * * *

\* \* \* \* \* \* \*

### Damages.

37. By reason of the aforesaid things done by defendants and their co-conspirators in violation of said Sherman Anti-Trust Act, the business and property consisting of said Liberty Theatre and Sedalia Theatre, in Sedalia, Missouri, has been greatly injured and damaged by reason of which plaintiff has lost income, profits, business, property and investments in at least the sum of $500,000.00.

\* \* \* \* \* \* \*

WHEREFORE, plaintiff prays judgment against the defendants, and each of them, for $1,500,000.00, together with a reasonable attorneys' fee and the costs and expenses reasonably and necessarily incurred in the prosecution of this action.

Gilbert Carter succeeded Mabel K. Carter as trustee of the Mabel K. Carter Trust upon her death, and was substituted as plaintiff in Civil Action No. 7940.

The antitrust action was not tried on the merits, but was settled by the parties.

On March 31, 1955, Gilbert Carter, trustee, executed an agreement and release which, after other appropriate recitations, stated among other things:

WHEREAS, party of the first part contends that Columbia Pictures Corporation, a New York corporation incorporated in 1924, Loew's Incorporated, a Delaware corporation incorporated in 1919, Paramount Pictures Corporation, a New York corporation incorporated in 1949, RKO Radio Pictures, Inc., a Delaware corporation incorporated in 1921, Twentieth Century-Fox Film Corporation, a Delaware corporation incorporated in 1952, Universal Pictures Co., Inc., a Delaware corporation incorporated in 1936, United Artists Corporation, a Delaware corporation incorporated in 1919, Fox Midwest Theatres, Inc., a Delaware corporation incorporated in 1933, and Warner Bros. Pictures, Inc., a Delaware corporation incorporated in 1953, and their respective predecessor, affiliated and subsidiary corporations, hereinafter referred to as parties of the second part, have injured him in his business and property constituting the Liberty and Sedalia Theatres by reason of things forbidden in the antitrust laws of the United States and more particularly by such acts and practices as are described and referred to in the case of *Gilbert Carter, Trustee* v. *Twentieth Century-Fox Film Corporation, et al.,* in the United States District Court for the Western District of Mis-

souri, Western Division, No. 7940, which contention parties of the second part deny, and

WHEREAS, party of the first part contends that by reason of the matters referred to in the next preceding paragraph he has suffered damage as a result of injury to his business and property constituting the Liberty Theatre and the Sedalia Theatre in the sum of Six Hundred Thousand Dollars ($600,000.00), and

WHEREAS, second parties by letter dated February 28, 1955, addressed to William G. Boatright, attorney for first party, offered to pay for full settlement of all claims and litigation of first party and other clients of William G. Boatright therein named and identified, an aggregate amount of $2,300,000.00, to be allocated among said clients as therein described, $600,000.00 being allocated to first party, and to do other things all expressly set forth in said offer, which is by reference incorporated and made a part hereof, and

WHEREAS, acceptance of said offer to be binding upon second parties was conditioned upon all of those to whom it was made joining in the acceptance of same and of all terms and conditions thereof applicable to their respective claims, and

WHEREAS, said offer provided that because of the amount involved it was necessary for the convenience of second parties that payment of same be partly in cash and the remainder spread over a number of years according to the schedule therein contained, and

WHEREAS, said offer provided that liability for payment of the sums set forth therein should be several as between second parties but that each of second parties would in event of acceptance be and become liable and responsible for payment of a designated part of the cash payment and of each annual deferred payment to each of said clients as set forth on Exhibit C, which is a part of said offer and is by reference incorporated and made a part hereof, and

\*       \*       \*       \*       \*       \*       \*

13. Party of the first part [Carter] agrees that simultaneously with the execution of this contract he will give to each of the parties of the second part, their respective predecessors, subsidiaries, affiliated corporations, officers, directors, agents, employees, successors and assigns a full and complete general release releasing all claims known or unknown of whatsoever nature and will join with parties of the second part in taking all necessary steps to dismiss with prejudice at the cost of the defendants the suit entitled *Gilbert Carter, Trustee v. Twentieth Century-Fox Film Corporation, et al.*, No. 7940, in the United States District Court for the Western District of Missouri, Western Division.

In the release Gilbert Carter as trustee agreed:

1. That he individually, as trustee or assignee, and in any other capacity or any other name or style whatsoever, hereby compromises, settles and forever discharges his above described claims and demands against parties of the second part and remises, releases, acquits and forever discharges all of the above named parties of the second part and each and all of their successors, predecessors, subsidiaries, parents, affiliates and assigns, including but not limited to any corporation, partnership, association or other business enterprise in which any one or more of them may have any interest whatsoever and the respective stockholders, directors, officers, agents, employees, representatives and servants of each and every one of them from any and all liability, all manner of actions, cause and causes of action, suits, debts, dues, sums of money, accounts, reckonings, bills, specialties, convenants, contracts, agreements, promises, damages, claims and demands whatsoever whether in law or in equity, whether now known

or not, which he individually or otherwise now has or ever had to and including the date of these presents, including but not limited to claims arising out of, pertaining to or by reason of damages, attorneys' fees, costs and expenses suffered by him individually, as trustee or assignee or in any other capacity in connection with the ownership, operation or leasing of any theatre, including but not limited to the Liberty Theatre and the Sedalia Theatre in Sedalia, Missouri, including but not limited to claims and damages of every kind, nature or description whether or not by reason of violations or claimed violations of the antitrust laws of the United States, but excluding all rights accruing to party of the first part by reason of the separate contract of settlement entered into contemporaneously herewith.

In accordance with the provisions of the "Agreement" and the "Release," Gilbert Carter, as trustee of the Mabel K. Carter Trust, received and distributed to beneficiaries of the trust in shares reported in the Form 1041 returns, the net amounts of $105,272.56 and $127,925.20 during the taxable years 1955 and 1956, respectively.

In the year 1956, prior to any distribution by the trustee in respect of the interests of those deceased beneficiaries in that year, David Carter, petitioner in Docket No. 80042, succeeded to all of the Emma M. Vollrath interest and to one-fourth of the Mabel K. Carter interest, under and in accordance with their respective wills and in the distributions of their estates, which interests, added to a 10 per cent interest he already owned, gave him a total interest of 25 per cent in the said trust. In the year 1956 he received from the trustee the following distributions: $12,792.52 in respect of the interest he acquired from Emma M. Vollrath, deceased; $6,396.26 in respect of the interest he acquired from Mabel K. Carter, deceased; and $12,792.52 in respect of the 10 per cent interest he already owned, making a total of $31,981.30.

In the year 1956, prior to any distribution by the trustee in respect of the interest of Mabel K. Carter, deceased, in that year, Gilbert Carter, petitioner in Docket No. 80007, succeeded to one-fourth of the Mabel K. Carter interest, which, added to the 2 per cent interest he already owned, gave him a total interest of 7 per cent in the said trust. In the year 1956 he received from the trustee the following distributions: $6,396.26 in respect of the interest he acquired from Mabel K. Carter, deceased, and $2,558.50 in respect of the interest he already owned, making a total of $8,954.76.

### OPINION.

The starting point in cases involving the taxability of amounts received as the result of litigation or the settlement thereof is, in general, the answer to the question, "In lieu of what were the amounts paid under the settlement received?" *Raytheon Production Corporation*, 1 T.C. 952, 958, affd. 144 F. 2d 110 (C.A. 1, 1944) ; *Ralph Freeman*, 33 T.C. 323, 327. Business profits are ordinary income. Therefore, if the amounts received are a substitute for or represent lost profits, they

are taxable as ordinary income. *Ralph Freeman, supra*. However, it has been held that in some circumstances profits may be utilized as a gauge in ascertaining the amount of damages for the destruction of or permanent injury to goodwill which is accorded capital gains treatment. *Durke* v. *Commissioner*, 162 F. 2d 184 (C.A. 6, 1947), reversing 6 T.C. 773 (1946), 181 F. 2d 189 (C.A. 6, 1950), affirming a Memorandum Opinion of this Court on remand. The only method of establishing that the goodwill, the going concern value of the business, has been partly or fully destroyed by the interference is by comparing the profits before the interference and the profits or lack of profits after the interference. It is not shown that petitioners carried any goodwill account on their books or had any measurable goodwill and we cannot find that any injury to goodwill has been shown in this case. As a matter of fact, petitioners concede that no basis for goodwill exists and we do not think it is necessary to pursue this aspect further.

The amounts in question arose from the settlement before trial of antitrust litigation for treble damages in which the plaintiff alleged that the defendant by many acts in violation of the antitrust laws injured and damaged the plaintiff by reason of "lost income, profits, business, property and investments." The settlement was paid by the defendants in a lump sum, the petitioners sharing in the proceeds through the trust described in our Findings of Fact. There was no allocation of the amount paid to any of the individual elements of damage claimed, i.e. "lost income, profits, business, property or investments." The Commissioner determined that the amounts received under the settlement were taxable as ordinary income, contending that they represented in the main, lost profits, taxable as ordinary income, *Ralph Freeman, supra*, and that at least part was a substitute for treble or punitive damages which are also taxable as ordinary income. *Commissioner* v. *Glenshaw Glass Co.*, 348 U.S. 426. His determination is prima facie correct and petitioners have the burden of proving him in error. *Chalmers Cullins*, 24 T.C. 322.

The Commissioner's position is substantiated by an examination of the pretrial proceedings held in the antitrust case. There the following colloquies took place:

*PRE-TRIAL PROCEEDINGS ON JANUARY 24, 1955*

Mr. BOATRIGHT: [Attorney for plaintiffs]

We are entitled to *recover the profits* that the Liberty Theatre would have made had it been operating first run. There is plenty of evidence to show what *those profits were* * * *.

* * * * * * *

[Plaintiff] * * * to choose the most favorable measure of damages to him. He might show it by rentals, he might show it by market value, he might show it by profits, loss of profits. Here we propose to show it by *lost profits*. We know what those profits would amount to down there. She is entitled to re-

cover *the full amount of profits* that she could have made had she been permitted to remain in the theater business for such period of time as the jury, under all the evidence, would find that she would have operated. * * *

### PRE-TRIAL PROCEEDINGS ON JANUARY 29, 1955

The COURT: Well, as I understand your claim— * * * you are merely making a claim because Mabel Carter undertook the operation of the theatre and she was forced out of business by the conspiracy and that is all the damages that you are claiming. You are not claiming any damages in depreciation of realty or in the production of revenue from realty.

Mr. BOATRIGHT: No, not in the nature of rent.

Mr. HARDY: [Of defense counsel] Claiming *profit* for a reasonable period of time.

Mr. BOATRIGHT: Claiming *the profits*, not for a reasonable period of time but *the profits* that she would have earned during all the time that she would have operated the business.

### PRE-TRIAL PROCEEDINGS ON FEBRUARY 7, 1955

The COURT: Now, as I understand, you are *limiting your claim* to the profits that you would have made—

Mr. BOATRIGHT: Yes.

The COURT: —from the operation?

Mr. BOATRIGHT: That *is all* we are going to ask the Court to submit. [Emphasis supplied.]

Petitioners concede that the amounts in question are taxable to them, but only as capital gains from which they are entitled to deduct basis in ascertaining the amount of gain. The petitioners do not predicate their claim of capital gains treatment upon the previously discussed goodwill situation but rather advocate an approach from a little different angle. They argue that the moneys recovered represent "damages for destruction of the business of Mabel K. Carter as an independent theatre operator" and constituted "the compulsory or involuntary conversion of a capital asset held for more than six months under section 1231, Internal Revenue Code of 1954." (This section of the 1954 Code has its source in section 117(j)(2), I.R.C. 1939, which is substantially unchanged.)

In explanation of the fact that lost profits were the criteria upon which they predicated their recovery in the antitrust case, they argue that it was not a recovery of lost profits per se that was sought by the action, but simply that the profits were to be used as a measure of damages for the destruction or partial destruction of the theater business.

In order for the petitioners to prevail under the theory they advance for capital gains treatment it is obvious that the property which petitioners claim was "involuntarily converted" into money must be a capital asset within the purview of the revenue laws. Even though under some circumstances the right to operate a theater business

might be classified as a "property right," this is not enough, as it still must qualify under the tax laws as a capital asset.

The "right to use its transportation facilities" was the basis of an involuntary conversion claim dealt with by the Supreme Court in *Commissioner* v. *Gillette Motor Transport, Inc.*, 364 U.S. 130. We do not believe that that right differs in any essential way from the right to engage in the theater business claimed by the petitioners in this case.

In *Gillette* the facilities of the taxpayer, a common carrier, closed down because of a strike, were taken over by the Government for temporary operation and the question was whether compensation paid for such temporary use was to be treated as capital gain for the "involuntary conversion" of property, or was ordinary income. The Supreme Court pointed out that while the taxpayer's "right to use its transportation facilities" was a "property right compensable under the requirements of the Fifth Amendment," it was not necessarily a capital asset within the meaning of section 117, I.R.C. 1939. The Court stated further that while the taxpayer's *facilities* were *themselves* capital assets, the Government did not take a fee in such facilities or physically damage them. All the Government did was to take "only the right to determine the use to which those facilities were to be put." This right was "not something in which respondent [taxpayer] had any investment, separate and apart from its investment in the physical assets themselves * * *. Further, the right is manifestly not of the type which gives rise to the hardship of the realization in one year of an advance in value over cost built up in several years, which is what Congress sought to ameliorate by the capital-gains provisions."

"In short," the Supreme Court went on to say, "the right to use is not a capital asset, but is simply an incident of the underlying physical property * * *." It held that there was no involuntary conversion of a capital asset and that the amounts paid for the use of the facilities were taxable as ordinary income.

Here, the petitioners had not before been in the theater business, except as lessors. They, or their predecessors, owned premises on which a theater was located which they had rented to others. There is evidence from which we could find this was profitable to the lessees based on operation of the theater and to the lessors based on rentals. But petitioners decided to go into the theater business themselves in 1940 when the lease terminated. They ceased operating in 1941 because the operation was not profitable. From the record here, it is a reasonable inference that the "movie" people (the defendants in the antitrust action) did not destroy a going business. However, what did occur was such an interference from the time the theater

business was begun by the petitioners that they were never able to navigate freely in the ordinary flow of business. If the suppression of such a right to do business is included within the protection of the antitrust laws, the basis of a judgment arising out of litigation involving such interference would be to place the injured parties in the same profit position they would have been in had there been no interference and to punish by additional damages the ones responsible for the interference. Certainly there has been no proof here of a sale or exchange or involuntary conversion of a capital asset which would entitle the amounts received under the settlement agreement to be considered as capital gains. It follows that the lump sum received in settlement before trial perhaps differs in degree but not in kind from any judgment that might have been rendered had the case gone to trial. If a judgment had been received it would have been entirely taxable as ordinary income being a substitute for lost profits, *Ralph Freeman, supra*, and punitive damages, *Commissioner* v. *Glenshaw Glass Co., supra*, and we think a settlement before trial based on the same criteria is also entirely taxable as ordinary income.

Having found that the petitioners' argument of involuntary conversion has no foundation we are unable to find any other proof introduced by the petitioners that would be sufficient to carry the burden the petitioners must bear in refuting the presumption of correctness that attaches to the Commissioner's determination. The Commissioner points to the fact that none of the participants in the settlement proceedings in the antitrust case testified in this case. This reference is probably to the attorneys who conducted the negotiations. Petitioners answer this by showing that the main protagonist of the petitioners was deceased at the time of trial of this case and that the film companies' lawyers were more "available" to the Commissioner than they were to the petitioners. We can only guess whether the testimony of these uncalled witnesses would have helped either party; but the burden of proof was on petitioners and their failure to call or the impossibility of calling the witnesses and thus carrying their burden of proof cannot be ascribed by petitioners to the Commissioner. In the circumstances a presumption that these witnesses, if called, would have testified adversely to petitioners could properly be raised. *Wichita Terminal Elevator Co.*, 6 T.C. 1158, affd. 162 F. 2d 513 (C.A. 10, 1947). However, even without this presumption we think petitioners have failed to prove their case. We hold the Commissioner's treatment of the proceeds of the settlement as ordinary income to be proper.

Our holding that the amounts received under the settlement agreement constituted ordinary income and that there was no involuntary conversion of a capital asset disposes of petitioners' contention that they are entitled to deduct "basis" in determining the amount of their

gain. We point out that some of the petitioners received a beneficial interest in the trust by devise or bequest. Even so, we think the amounts received by such petitioners must be included in their gross income as "income in respect of a decedent" under section 691(a) of the 1954 Code. Such income "has the same character in the hands of the recipient as it would have in the hands of the decedent." *Edna S. Ullman*, 34 T.C. 1107 (1960). In this case we have held that the amounts would have been ordinary income had they been received by decedents Emma M. Vollrath and Mabel K. Carter. It follows that they are ordinary income in the hands of petitioners since they were not received from a sale or exchange of the right to receive such amounts. *Edna S. Ullman, supra.*

Decisions will be entered under Rule 50.