Peter K. Pappas and Anthea Pappas v. Commissioner.
Pappas v. Commissioner
Docket No. 89791.
United States Tax Court
T.C. Memo 1962-203; 1962 Tax Ct. Memo LEXIS 106; 21 T.C.M. (CCH) 1099; T.C.M. (RIA) 62203; August 24, 1962
*106 Petitioners received certain amounts in the compromise settlement of an antitrust suit they had filed. Held, the sums were received in lieu of profits lost because of alleged violations of the antitrust laws and are, accordingly, taxable as ordinary income. Peter T. Manos, Esq., 31 Mamaroneck Ave., White Plains, N. Y., for the petitioners. Gerald N. Daffner, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined a deficiency of $5,782.87 in the income tax of petitioners for the year 1955. The sole issue before us is whether the net amount received by petitioners in *107 settlement of a civil antitrust suit brought by them as plaintiffs is taxable as ordinary income or as capital gain. Findings of Fact Petitioners, husband and wife, filed their joint return for the calendar year 1955 with the district director of internal revenue, Newark, New Jersey. Petitioner Anthea Pappas is involved herein solely by reason of having filed a joint return with her husband. Therefore, Peter K. Pappas will hereinafter be referred to as the petitioner. Petitioner and his brother, George Pappas, prior to George's death in 1953, were engaged in the operation of motion picture theatres in the Borough of Milton, Northumberland County, Pennsylvania. They did business as partners under the partnership name of Pappas Brothers (hereinafter referred to as "the partnership"). From 1924 to 1933 the partnership operated the Bijou Theatre in Milton. From July 15, 1933, to March 31, 1953, it operated the Legionnaire Theatre. The partnership first leased the premises on which the Legionnaire Theatre was located but on December 30, 1941, it purchased the building (at a cost of $24,000). The Legionnaire Theatre was always operated as an independent (unaffiliated) movie theatre. *108 From the commencement of its operation of the Legionnaire Theatre, the partnership found it impossible to obtain desirable (class "A") motion pictures for exhibition to the public and thus was compelled to display only inferior (class "B") pictures. The reason for such inability was an agreement between certain motion picture producers and distributors [1] and Comerford Theatres, Inc., under which Comerford alone was permitted to lease all the class "A" films and even the better class "B" films made available for distribution in Milton and its vicinity. Comerford operated a chain of about 55 motion picture theatres in Pennsylvania and New Jersey. Whereas the partnership had theretofore been operating the only theatre in Milton, in 1934 Comerford opened the Capitol Theatre in the same vicinity. As a result the partnership could exhibit only double-features, westerns, *109 and repeats, and attendance at the Legionnaire Theatre declined seriously and steadily; by 1952 it was operating only about 3 days per week. In 1951, petitioner and George decided upon institution of legal action based upon the alleged monopolistic practices of the film distributors and Comerford. On August 3, 1951, a civil action was commenced against such parties in the United States District Court for the Middle District of Pennsylvania. The complaint was filed under sections 4 and 16 of the Clayton Act [2] and sections 1 and 2 of the Sherman Act [3] and alleged the aforementioned sequence of events leading to the decline in the partnership's business. It concluded: As a result of the discrimination against Plaintiffs which Defendants have accomplished and are accomplishing through said monopoly and conspiracy, Plaintiffs have suffered great loss and damage to their business, to wit, the sum of Five Hundred Thousand Dollars ($500,000). WHEREFORE, Plaintiffs pray: * * *
B. That the Defendants be ordered to pay to the Plaintiffs treble the amount of damages sustained by Plaintiffs. *110 Petitioner was represented in the suit by a law firm in Williamsport, Pennsylvania. In August 1952, George suffered a stroke and thereafter could not be active in the management of the theatre. Thus, petitioner was thereafter obliged to operate the theatre alone. George died on February 1, 1953, and petitioner was appointed administrator of his estate. Petitioner was also the sole residuary legatee of George's estate. Finally, on March 31, 1953, petitioner who had been rather ill himself despaired of rejuvenating the business and ceased operating the Legionnaire Theatre. After this date, the property was not used as a motion picture theatre. The building had been specially equipped with projection equipment, seats, etc. (cost $24,500) so that petitioner attempted to sell it intact to be operated as a motion picture theatre. However, due largely to the unfortunate experience of the Legionnaire Theatre, there were no interested buyers and petitioner was unable to sell the building until 1958 when he did so at a loss of $2,850. In October 1955, the civil action was settled before trial for the gross amount of $55,000, at which time petitioner, individually and as George's administrator, *111 executed a release discharging all the defendants from further liability on all causes of action. The civil action was then dismissed with prejudice. After payment of attorney's fees and other costs, the net amount of the settlement received by petitioner was $23,986. This was the entire net recovery as petitioner was the sole residuary legatee under George's will and the whole settlement thus belonged to him. Respondent, in his notice of deficiency, determined that the entire net proceeds received by petitioner in 1955 were taxable to him as ordinary income in that year. The settlement received by petitioner in 1955 was in lieu of lost profits and did not represent a recovery of good will. Opinion As we noted in Estate of Mabel K. Carter, 35 T.C. 326, 332 (1960), affd. 298 F. 2d 192 (C.A. 8, 1962), certiorari denied 370 U.S. 910, the critical inquiry in cases of this nature is: "In lieu of what were the amounts paid under the settlement received?" Raytheon Production Corporation, 1 T.C. 952, 958, affd. 144 F. 2d 110 (C.A. 1, 1944); Ralph Freeman, 33 T.C. 323, 327 (1959). If the recovery represents *112 damages for lost profits, it is taxable as ordinary income. However, if it represents a replacement of capital or good will, it is nontaxable to the extent that it does not exceed the basis of the capital interest or good will destroyed and the excess of the recovery over such basis is capital gain. Ralph Freeman, supra, and cases there cited; Sager Glove Corporation, 36 T.C. 1173 (1961), on appeal (C.A. 7), and cases there cited. The burden of proof falls upon petitioners to demonstrate what portion of the recovery, if any, constitutes nontaxable income or capital gain. Sager Glove Corporation, supra. In the instant case, petitioners maintain that the recovery was compensation for loss of good will although they concede that their basis for such good will is zero. Accordingly, they argue that the entire recovery should be taxed as long-term capital gain. On the state of the record, we must conclude that petitioners have failed to sustain their burden. The antitrust complaint was filed in 1951, prior to the termination of the partnership business and the alleged "taking" of the good will. Significantly, it was never amended after the cessation *113 of the business in March 1953 even though there was an interval of more than 2 years between that date and the settlement of the lawsuit in October 1955. Thus, we find it impossible to conclude that loss of good will was any part of the gravamen of the complaint. Estate of Mabel K. Carter, supra, at pages 335, 336; cf. Commissioner v. Gillette Motor Co., 364 U.S. 130 (1960). On this point we think that the decision in Durkee v. Commissioner, 162 F. 2d 184 (C.A. 6, 1947), remanding 6 T.C. 773, upon which petitioners place such strong reliance, is distinguishable. However, petitioners argue that the original complaint (although never amended or superseded) was "outmoded" by 1955 and that their settlement was nevertheless based upon the loss of good will arising in 1953. Perhaps there are situations in which facts never alleged in the pleadings may become the basis of subsequent settlements of pending lawsuits. But, if such were the case, it is strongly incumbent upon the taxpayer to show how such unpleaded facts nevertheless entered into the negotiations. Toward this goal, petitioners have exerted considerable effort to establish *114 the existence and amount of good will (based upon the partnership's 5-year earnings of 1944-1948) computed in purported compliance with respondent's ruling, A.R.M. 34, 2 C.B. 31. Arguendo, we may assume that this amount has been correctly computed, and we may further assume, despite some contrary indications in the record, [4] that the loss of such good will was due entirely to the alleged illegal monopolistic practices of the defendants named in the complaint. However, this proof avails petitioners of nothing without a further showing that the settlement was in fact based upon such compensable loss of good will. As we observed in Sager Glove Corporation, supra, at page 1182: But irrespective of whether the petitioner did in fact sustain some damage to its goodwill or to other capital assets, the ultimate question to be determined here is whether the amount paid in settlement was, to any extent, for such damage. Sager himself testified that he did not participate in the settlement negotiations and the persons who did engage in such settlement did not testify. * * * *115 The observation is pertinent here. In the instant case, petitioners called as their witness an attorney from the New York City law firm which served as general counsel for one of the defendants in the antitrust litigation. This attorney testified that, at the request of petitioner and his accountant in 1960, he had studied the office file pertaining to the suit and had learned that the settlement was authorized on the basis of recommendations made by the local counsel in Pennsylvania who were handling the litigation. However, the file was never produced nor was the attorney further interrogated as to the details of the settlement and its attendant negotiations. Depositions were taken in preparation for the antitrust trial and were available at the hearing of the instant case, but they likewise were not introduced by petitioners. Nor did the attorneys for the plaintiffs in the antitrust suit testify as to the basis for settlement thereof. [5] We must necessarily assume that these items of evidence if produced would have been unfavorable to petitioners. Wichita Terminal Elevator Co., 6 T.C. 1158, affd. 162 F. 2d 513 (C.A. 10, 1947); Estate of Mabel K. Carter, supra, at p. 336. *116 Petitioners, on brief, place great stress upon the fact that the net recovery ($23,986) was approximately the amount of the partnership's good will as computed by petitioners ($23,874.15). [6] Cf. Sager Glove Corporation, supra, at p. 1181, where, in holding that the taxpayer had received ordinary income, we relied in part upon the identity of the net recovery and the amount which the taxpayer's representative had claimed as lost profits at the antitrust trial. However, here no evidence was introduced to explain *117 the closeness. We do not even know whether petitioners bargained on the basis of a net rather than a gross recovery but surely the odd amount of the net figure in marked contrast to the even amount of the gross figure ($55,000) tends to refute any contention that petitioners' attorneys were dickering with the former in mind. Nor are we told whether the good will figure here introduced had even been submitted during the pendency of the litigation. It may well be that it was first computed for purposes of this proceeding. Considering this total absence of explanation, togther with the complete failure of petitioners to give us any insight into the negotiations which produced the recovery, we cannot conclude that the proximity of the two figures is other than coincidental. *118 Beyond petitioners' failure to sustain their burden of proof in this case, we believe there is affirmative evidence tending strongly to show that this recovery was based upon lost profits. At the trial of this case, petitioner sought at one point (when the question was put to him directly) to deny that the recovery was so founded. However, he was thoroughly contradicted in this regard by his depositions taken in preparation for the antitrust suit. Not only do these depositions cast doubt upon the credibility of petitioner's above-mentioned testimony in this proceeding, but also we believe that they are admissible into evidence for the substantive purpose of establishing the truth of the matters there stated [7] as they are admissions by a party opponent. These depositions are particularly valuable because they afford us insight into the contentions *119 of the parties during the pendency of the suit. In these depositions petitioner stated: "If I do recall, I had advised me, I do not recall the names and so forth for certain shows playing at the Capitol, the gross business they had been doing and at the same time the gross business I had been doing on those days, and compared a lot of times the business they had been doing and the business I was doing, so we figured out in the end that amount we should have had in profit and losses." * * *
Q. * * * "I am not talking about the gross receipts. I am now talking about the profit and loss of the Capitol Theater and I am asking you whether you knew what the profit and loss of the Capitol Theater was before you filed a complaint in this case." "A. That is what I mean, Mr. Adams. I have been estimating this difference of business right from the beginning of 1935, when the Capitol Theater opened." In discussing the original $500,000 claim, petitioner stated: Q. * * * "Q. All right, when you got that figure, what did you do with it?" * * * "A. And my surprise was, like I mentioned before, it was a few shows was more than $500, the amount the Comerford Theaters, Inc., the Capitol *120 Theater, Milton, paid to the producers of certain kinds of a show; that meant that must have been very, very much more profit from the amount Comerford Theaters, Inc., paid for the major film company rental price for that show, and I said by estimating such profits for certain amount of shows, and comparing them for the balance of the week, for the balance of the shows, at the end of each year they [sic] should have been a certain amount of profit made for the Capitol Theater in Milton, and during this 17 or 18 years of time we come to the amount, as we mentioned before, of $485,000 should have been our profit and the losses we suffered to the closing of our theater on March 31, 1953." * * *
"Q. Going back to this $500,000 figure, as I understand it now, and you correct me if I am not correct, your feeling is if the distributors had given the Legionnaire Theater one half of the "A" pictures, the Legionnaire Theater would have made the same profit as the Capitol Theater did, and it is your opinion, if the Legionnaire Theater made that profit, it would have averaged roughly $29,000 a year?" "A. I would say yes, if not more, Mr. Adams." * * *
"Q. How did you give them *121 that amount?" [$500,000] "A. From the estimating I had made myself." "Q. Did you say the amount of damages is $500,000?" "A. After estimating so much per week and so much average per year, and we brought the amount for this entire years for $500,000." This evidence leaves little room for doubt that petitioner was persistently and aggressively seeking a recovery based upon lost profits. Over and above these depositions, petitioner's testimony in the trial of the instant case, when carefully scrutinized reveals that petitioner (despite his pro-forma denials on this subject) actually insisted that his claim had been based upon loss of profits during the course of the alleged monopolistic practices by the various defendants. In an attempt to justify the $500,000 amount sought in the complaint he stated on cross-examination: Q. When you instituted your antitrust suit in 1951, the amount of the suit was $500,000, is that true? A. Yes. Q. Was this figure arrived at by a comparison of past profits that you considered you and your brother would have realized had there been no interference? A. That is what my attorneys estimated the amount was for by Comerford Theaters competitors *122 using the "A" class shows and nothing was leaving for ourselves. Q. Was it an estimate of the amount of profits you felt you had lost during this period, or the amount of gross receipts? A. That is what our attorneys was figuring that if we were able to secure better shows like the competitors used to do, we should have done a very much better business than we used to do. We recognize of course that the request for damages in the concluding paragraph of a complaint generally has very little independent probative value. Naturally, we do not give it credence in so far as it might bear upon the true amount of damages. The point we do regard as significant, however, is that in his endeavor to support the claimed damages, petitioner resorted to the contention that they represented a fair approximation of the profits of which the partnership had been deprived due to the monopoly practices of its competitor. Considering all of the above, we hold that the settlement was received in lieu of lost profits. Accordingly, it is taxable as ordinary income. Decision will be entered for the respondent. Footnotes
1. These parties were: Loew's Inc., Paramount Pictures Theatres Corporation, RKO Radio Pictures, Inc., Twentieth Century-Fox Film Corporation, Columbia Pictures Corporation, Warner Bros. Pictures, Inc., Universal Corporation, Universal Film Exchanges, Inc., United Artists Corporation, and Eagle Lion Films, Inc.↩
2. Act of October 15, 1914, ch. 323, 38 Stat. 730, 15 U.S.C. secs. 15, 26 (1958 ed.)↩. 3. Act of July 2, 1890, ch. 647, 26 Stat. 209, 15 U.S.C. secs. 1, 2 (1958 ed.)↩.
4. At the time the business terminated, petitioner himself was in poor health, his brother had just died, and the wartime boom in the motion picture business had run its course. These factors appear to have contributed, to some undetermined extent, in the partnership's decision to discontinue operation of the theatre.↩
5. These attorneys signed the stipulation for dismissal on behalf of the plaintiffs. We do know that they were available to petitioners at least as recently as 11 months prior to trial of the instant proceeding, for on that date they furnished an affidavit to petitioners purporting to explain the basis of the antitrust settlement. Petitioners' failure to call these witnesses who were presumably available makes this case even stronger for the respondent than was the Carter case where we noted that "the main protagonist of the petitioners [in the settlement of the litigation] was deceased at the time of the trial of this case." (35 T.C. at 336↩)
6. At the trial of this case, petitioners' accountant stated that, under his computation, good will was $23,874.15. On brief, petitioners corrected certain arithmetical errors the effect of which was to reduce the figure to $23,668.74. For argument's sake, we shall give petitioners the benefit of the doubt and assume that if the bargaining did give recognition to loss of good will it would have been on the basis of the former figure. This makes the good will closer to the settlement figure ($23,986) and to that extent strengthens petitioners' argument.↩
7. Although the point is not argued by respondent, it would seem that there is a material nonhearsay purpose which these depositions may serve. They are affirmative evidence of the representations made by petitioner to induce the settlement. We can logically assume that they were given some weight in arriving at the ultimate settlement.↩