CHARLES COLOMBO AND MARGARET COLOMBO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent SAM COLOMBO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Colombo v. Commissioner
Docket Nos. 6212-73, 6213-73.
United States Tax Court
T.C. Memo 1975-162; 1975 Tax Ct. Memo LEXIS 209; 34 T.C.M. (CCH) 733; T.C.M. (RIA) 750162; May 28, 1975, Filed James P. Grane and William T. Monroe, for the petitioners. James E. Dunn, Jr., for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies in income tax in these consolidated cases as follows: Docket No.
Petitioner
Year
Deficiency
6212-73
Charles Colombo and
Margaret Colombo
1970
6,146.87
6213-73
Sam Colombo
1970
5,080.16
Petitioners having conceded an adjustment with respect to personal withdrawals of merchandise, the only issue remaining for decision is whether a payment in the amount of $50,000 made by Gulf Oil Corp. to a partnership in which Sam and Charles Colombo were equal partners in 1970 was includable in the gross receipts of the partnership as a bonus or prepaid income, *210 and thus became taxable income to petitioners, or was a loan. FINDINGS OF FACT Charles and Margaret Colombo were husband and wife residing in Cleveland, Ohio, when their petition herein was filed. They filed a joint Federal income tax return on the cash basis of accounting for the taxable year 1970 with the district director, Internal Revenue Service, Cleveland, Ohio, on October 19, 1971. Sam Colombo was residing in Cleveland, Ohio, when his petition herein was filed. He filed an individual Federal income tax return on the cash basis of accounting for the taxable year 1970 with the district director, Internal Revenue Service, Cleveland, Ohio, on October 26, 1971. Charles and Sam Colombo, hereinafter referred to as "petitioners," were equal partners in a partnership which operated a carwash on property owned by petitioners. By instruments dated September 1, 1970, petitioners entered into an agreement to buy, sell, and distribute Gulf Oil Corp. products at their carwash location. Although the agreements with Gulf Oil Corp. were entered into in the name of Colombo Enterprises, Inc., the partnership was not incorporated until July 1, 1971. The arrangements with Gulf were evidenced *211 by various documents, all executed by the parties as of September 1, 1970, which appear to be standard printed form documents used by Gulf with the blank spaces filled in according to the terms of each such arrangement. The documents consisted of printed forms entitled "Contract of Sale," "Memorandum of Agreement," "Commodity Schedule," "Travel Card Agreement," "Automotive Gasoline Agreement (Delivery and Storage)," and "Amortization Agreement." In the "Contract of Sale," in consideration of the mutual promises contained therein, Gulf agreed to sell and deliver to the partnership, and the partnership agreed to purchase, receive, and pay for, Gulf Petroleum products of the kinds and quantities and under the terms and conditions set forth in the "Commodity Schedules" annexed thereto. Two "Commodity Schedules" were attached. One related to automotive lubricating oils and greases and estimated the purchaser's annual requirements as not to exceed 3,000 gallons, for delivery in equal monthly quantities by tankwagon. The price was stated as seller's established current prices in effect on date of delivery as shown on an attached "Contract Price Schedule" (which was not attached to the copy *212 stipulated into evidence). The schedule was to be effective for 10 years. The other "Commodity Schedule" attached related to No-Nox Gasoline and Good Gulf Gasoline which was to be delivered to purchaser by tankwagon in approximately equal monthly quantities, as required, up to the purchaser's maximum annual quantities, at the seller's scheduled price in effect at the time of delivery. This schedule was also effective for 10 years. No price schedule was attached. The "Automotive Gasoline Agreement (Delivery and Storage)" provided Gulf with the right to deliver to the partnership's service station quantities of gasoline to be placed in the storage tanks "now located or later installed by Gulf" on the partnership premises in such quantities and at such times as Gulf saw fit. The partnership agreed to hold such gasoline for Gulf, without compensation, until such time as it sold the gasoline. Title to the gasoline remained in Gulf until it was sold from the partnership pumps, at which times the partnership was to pay Gulf its dealer-tankwagon price for the gasoline so sold. The "Memorandum of Agreement" prefaces the agreements with the statement that, in order to carry out its agreement *213 to purchase petroleum products from Gulf, the partnership has requested Gulf to loan and install equipment for the storage, handling, and advertising of such products on its premises. There follows the terms of an equipment lease from Gulf to the partnership of the specified equipment to be installed by Gulf, for a period of 10 years at an annual rental of $1, with title to the equipment remaining in Gulf and with Gulf having the right to remove the equipment in the event the partnership ceases to purchase and resell Gulf products and pay for same. The "Travel Card Agreement" is not relevant here. Under a separate "Amortization Agreement" entered into the same day by the partnership and Gulf, the partnership agreed that in consideration for $50,000 being expended by Gulf to cover the cost of "site improvement & equipment installation" on petitioners' property, the partnership had signed a 10-year contract covering its requirements of Gulf products, and further agreed as follows: 1. To pay all costs for improvements in excess of $50,000.00.
2. To purchase during the term of the aforesaid Sales Contract a total of 2,850,000 gallons of Gulf Gasolines, and in all other *214 respects fully perform all of the obligations of said contract, and further agree that if I/we should not fulfill our obligations to purchase and accept delivery at the above mentioned premises of 2,850,000 gallons of Gulf Gasolines during the term of the aforesaid contract for any reason or breach the aforesaid Sales Contract in any other manner during the term of said contract, I/we will pay to Gulf Oil Corporation the sum of $50,000.00 less the percentage thereof which is equal to the percentage that the actual gallons of said Gulf Gasolines purchased and delivered to the aforesaid premises bears to 2,850,000 gallons. It is agreed that the records of Gulf Oil Corporation as to the number of gallons of Gulf Gasolines purchased and delivered and the sum due Gulf Oil Corporation as computed herein shall be conclusive. The partnership was not required to give Gulf any evidence of indebtedness other than the above and there was no provision for payment of interest on any amount that might have to be paid to Gulf under the above agreement. Gulf expended $50,000 under the above agreements before the end of 1970. A representative of Gulf checked the partnership *215 gasoline pumps with a representative of the partnership to determine the number of gallons and grade of gasoline that had been sold by the partnership each week. The partnership then mailed to Gulf each week a check in an amount determined by multiplying the number of gallons of gasoline of each grade sold by the partnership by Gulf's tankwagon price for each grade of gasoline. Petitioners made no payments specifically or separately allocated to repayment of the $50,000 furnished by Gulf. Gulf charged all of its dealers in the Cleveland area the same price for its various grades of gasoline and the partnership paid that "tank-wagon" price. The partnership did not include any part of the $50,000 furnished by Gulf in its gross receipts for 1970. It cannot be determined from the record whether any part of the payments made by the partnership to Gulf for gasoline delivered and purchased in 1970 was omitted from the partnership's cost of goods sold. On the partnership return of income filed by the partnership for 1970, it reported ordinary income in the amount of $4,159. Each of the petitioners included one-half of that amount, or $2,080, in their taxable income for 1970. In his notices *216 of deficiency respondent determined the entire $50,000 paid by Gulf "constitutes a bonus or prepaid income includable as gross receipts under Sections 451 and 61 of the Internal Revenue Code of 1954." Respondent increased each petitioners' taxable income from the partnership $25,000. OPINION Petitioners claim that the $50,000 paid by Gulf in 1970 was a loan to the partnership, not includable in its gross income, that the "Amortization Agreement" requires a repayment of the loan, and that the loan was actually being repaid by the partnership with each payment it made to Gulf for gasoline purchased. They say that of the payments the partnership made to Gulf for each gallon of gasoline 50,000 / 2,850,000 of each dollar, or $.01754, was allocated to repayment of the $50,000 loan. What evidence there is in the record does not support petitioners' argument. We have stated the essence of the various documents executed by Gulf and the partnership to evidence their agreements or arrangements in our findings of fact. The first three documents described shed little light on the issue before us except to reflect the general scheme under which Gulf was to deliver its *217 petroleum products to the partnership for sale by the partnership. It appears that Gulf was to deliver the products to the partnership for storage in tanks installed or to be installed on the partnership premises by Gulf until such time as the partnership withdrew those products for sale to its customers at its pumps. Title to the products apparently passed to the partnership at that time and the partnership at that time became obligated to pay Gulf for the products withdrawn, at Gulf's listed dealer prices. The "Memorandum of Agreement," or equipment lease, indicates that Gulf would install on the partnership premises certain equipment necessary for the operation of a gas station and rent it to the partnership for a period of 10 years at an annual rental of $1. Title to the equipment was to remain in Gulf and Gulf had the right to remove it in the event the partnership ceased to purchase and resell Gulf products and pay for same. Petitioners rely primarily on the "Amortization Agreement" in support of their position, most of the terms of which are quoted in our findings of fact. By this agreement the partnership agrees, in consideration for the $50,000 being spent by Gulf to cover *218 the costs of site improvements and equipment installed at petitioners' property, that if the partnership does not purchase 2,850,000 gallons of Gulf gasoline during the 10-year term of the purchase agreement it will pay Gulf a percentage of the $50,000 determined by the ratio of the gallons of gasoline actually purchased to the 2,850,000 gallons agreed to be purchased. Our analysis of the arrangements reflected in the documents discussed above is that Gulf and the partnership agreed that the partnership would market Gulf's products for a period of 10 years, taking title to and paying Gulf for the products as it sold them at Gulf's standard dealer price for the products. To facilitate the storage and handling of its products until they were sold by the partnership, and to assist in the marketing of its products, Gulf paid $50,000 toward the cost of site improvements and equipment used for that purpose, in return for which the partnership agreed to buy 2,850,000 gallons of Gulf's gasoline during the 10-year term of the lease. To encourage the sale of its products and to protect its investment, Gulf exacted an agreement from the partnership to repay Gulf a proportionate part of the *219 $50,000 in the event the partnership did not purchase the full 2,850,000 gallons prior to termination of the agreement. Under these arrangements the partnership had no obligation to pay Gulf anything if it fulfilled its part of the bargain. No interest was called for on any amount the partnership might become obligated to pay. The repayment part of the agreement thus resembles a forfeiture penalty for failure to perform the contract. It has none of the characteristics of a loan from Gulf to the partnership; there was no fixed obligation to repay nor any intent on the part of the partnership to repay the full amount or any specific portion thereof; nor was there any intent on the part of Gulf to require repayment of the entire $50,000. See Anson Beaver,55 T.C. 85. Petitioners argue that a portion of the $50,000 was being repaid each time the partnership paid for the petroluem products it purchased from Gulf. The evidence does not support such allegation. The contract called for the partnership to pay Gulf's standard dealer prices for its products. Gulf's supervisor of sales for the Cleveland area testified that Gulf was required by law to charge all dealers a *220 standard price and that the partnership was not given a discount on the products it purchased from Gulf. Petitioners' only witness, Margaret Colombo, who was bookkeeper for the partnership, testified that only one check was sent to Gulf each week in payment for the petroleum products purchased. This was an amount calculated by multiplying the number of gallons of each grade of Gulf products sold each week, as determined by Gulf's representative, by Gulf's standard price for the products sold. Thus, no part of the payments could have been allocated to the $50,000 "loan" unless the price paid to Gulf for its products was discounted. While the books and records of the partnership were not offered in evidence, there is no indication in the record that a portion of each payment to Gulf was separately accounted for on the partnership books as repayment of a loan. In fact, a pro-forma balance sheet of the partnership as of December 31, 1970, offered in evidence by petitioners' accountant, reflects a long-term debt payable to Gulf in the full amount of $50,000 with no credit for any payments thereon. Neither Charles nor Sam Colombo testified to give us their understanding of the agreement. *221 And no representative of Gulf qualified to testify with respect thereto was produced as a witness to testify with regard to Gulf's understanding of the agreement. Petitioners rely on certain correspondence between representatives of the partnership and Gulf to imply that Gulf treated the $50,000 as a loan for accounting purposes. In the first place the letters from Gulf offered in evidence are not in form acceptable as proof of the contents thereof. Rule 143(b), Rules of Practice and Procedure, United States Tax Court. But even if so, the letters do not support petitioners' contentions. In reply to an inquiry from petitioners' accountant, Gulf's associate general counsel in 1972 advised that Gulf advanced $50,000 to "subject party" in 1970 for site improvements in exchange for a 10-year sales contract with stipulated volume purchase obligations, and that Gulf's accounting treatment was to set up the advance as a prepayment, applicable to future accounting periods, to be amortized (and charged to expense) over the 10-year period. A prepayment cannot be considered a loan. See Bouchard v. Commissioner, 229 F. 2d 703 *222 (C.A. 7, 1956), affg. a Memorandum Opinion of this Court. While the documentary evidence suggests that the $50,000 was paid by Gulf for site improvements and equipment, title to which would remain in Gulf, we have no evidence of how the $50,000 was actually paid, or what it was actually used for, or how it was accounted for on the partnership books. All we have is a stipulation that the "$50,000 specified in the 'Amortization Agreement' * * * was expended by Gulf Oil Corporation prior to the end of the taxable year 1970." Respondent determined that the $50,000 constituted gross income to the partnership in 1970. Assuming that the $50,000 was paid to or for the benefit of the partnership in 1970, it could be considered gross income to the partnership in 1970, and any contingent obligation the partnership might have to repay all or part of it in the future would not offset that income. Mitchell v. Commissioner,89 F. 2d 873, 876 (C.A. 2, 1937). The burden of proof is on petitioners to prove error in respondent's determination. Petitioners have not carried their burden, *223 and we must affirm respondent's determination. See Estate of Mabel K. Carter,35 T.C. 326, affd. 298 F. 2d 192 (C.A. 8, 1962).[1]
Decisions will be entered for the respondent.
Footnotes
1. See Northeast Coal & Dock Corp.,T.C. Memo. 1961-199↩.